# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
CRISTIAN RENTERIA,
Defendant and Appellant.

S266854

Fifth Appellate District
F076973

Tulare County Superior Court
VCF304654

---

August 25, 2022

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Groban, Jenkins, and Guerrero concurred.

---

PEOPLE v. RENTERIA

S266854

Opinion of the Court by Kruger, J.

Late one August night, Cristian Renteria walked through a neighborhood in Tulare and fired a gun at a house. Then, after a dog barked next door, Renteria fired the gun at that house, too. For this episode — which fortunately did not result in any injuries — a jury convicted Renteria of two counts of shooting at an inhabited dwelling. (Pen. Code, § 246.) That offense is ordinarily punishable by no more than seven years of imprisonment. (*Ibid.*) But the prosecution alleged that Renteria was subject to indeterminate life terms for the shootings because he committed the crimes "for the benefit of . . . any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, former § 186.22, subdivision (b)(4).) While Renteria was a gang member, there was no evidence he was accompanied by any other gang members at the time of the shooting. The jury nonetheless found the gang allegation true, and Renteria was sentenced to two indeterminate terms of life imprisonment.

Renteria challenged the gang penalties as unsupported by the evidence, but the Court of Appeal affirmed, relying on an expert's testimony that a gang member's acts of violence both benefit the gang and promote its members' criminal activities by enhancing the gang's reputation for violence in the community.

We granted review to address the showing the prosecution must make to establish that Penal Code section 186.22 gang enhancements or penalties apply to a crime committed by a gang

1

member who acts alone. Not every crime committed by an individual gang member is for the gang's benefit or to promote criminal conduct by gang members, as the gang enhancement statute requires in such cases; gang members can, of course, commit crimes for their own purposes. Without more, expert testimony about the reputational benefits of crime does not support an inference that a lone gang member committed a crime for gang-related reasons — as opposed to acting from other, more personal motives. Because there was no adequate basis for drawing the necessary inference about Renteria's intent in this case, we reverse the judgment of the Court of Appeal and remand for resentencing.

## I.

Because this case concerns the sufficiency of the evidence supporting the gang penalties, we review the trial evidence in some detail. Evidence concerning the circumstances of the shootings came largely from the testimony of a neighbor, Anthony A.[1] Earlier on the evening of the shooting, Anthony became aware of a group of young men walking through an empty field near his house; he heard some of them yelling "Sur trece," a gang reference. Anthony went outside to tell the young men he did not want any problems and recognized Renteria among them. Renteria told Anthony that a couple of his companions were drunk and he was trying to help them home. A "little while" later, Anthony heard a "pop" in the field, went back outside, and saw Renteria and a person he did not recognize walk past. Anthony lost sight of the two for "at least

---

[1] We identify the witnesses as they were identified in the opinion of the Court of Appeal. (See Cal. Rules of Court, rule 8.90(b).)

one or two minutes," and then saw Renteria return and shoot at the house of Anthony's neighbor Jack D. After the first shots, dogs from the house next to Jack's began barking. Renteria then shot at that house before shooting again at Jack's and running away.

A few days after the shooting, Officer Jacob Adney arrested Renteria. Earlier police contacts with Renteria indicated that he admitted being a Sureño[2] gang member in 2008, when he was in middle school, and had been detained in 2011 on suspicion of spray painting gang-related graffiti in an abandoned house. After his 2014 arrest for the current offense, Renteria again admitted belonging to a Sureño gang. Renteria also acknowledged that earlier the day of the shooting he had been "hit up" — someone asked where he was from, a question understood to be a gang challenge. When Renteria heard what sounded like a shotgun being racked, he ran. Renteria assumed Northern gang members were responsible.

Jack D. testified that he lived with his wife and four grandsons and that neither his children nor grandchildren were involved in any gangs. An officer investigating the shooting noticed bullet holes in Jack's garage door and opened it to see if anyone was injured. No one was inside, but the officer saw a sawed-off shotgun in the garage.

Officer Adney testified as a gang expert. He explained that in gang culture, respect is everything and that gang members are expected to retaliate if they are the victim of a

---

[2] At trial, counsel and the witnesses used "Southerner" and the Spanish "Sureño" interchangeably to signify a member of the gang. Similarly, they used "Northerner" and "Norteño" to signify the rival gang.

crime, otherwise they lose their respect. Officer Adney believed that a crime committed by a gang member would benefit or promote the gang, even if the victim were not a rival gang member, because people would see a gang crime in the news and would be reluctant to cooperate with the police or testify against the gang. Officer Adney said that unless gang members identify their gang during a crime, "[t]here's really no way — it's kind of hard to know which gang — if it is a gang, which gang is responsible."

Officer Adney explained that Northerners are rivals of Southerners and the two groups typically fight over territory. But unlike in other regions where gangs control specific territory with defined boundaries, in Tulare County a gang member's turf "is simply where that person lives at that time." Southerners identify with the number 13 and the words Anthony heard — "sur" and "trece" — mean "south" and "13" in Spanish. The prosecutor tried to elicit Officer Adney's opinion that some of Jack's grandsons were Northerners, but that opinion was not forthcoming. Officer Adney instead testified to a different connection: that a man named Robert P. did not live with Jack but was "associated" with the residence and that Adney had personally seen Robert in the company of Northerners. Officer Adney opined that a person who had been threatened by Northerners and who shot at the houses while yelling "Sur trece" would be showing that he was retaliating, thus elevating his own status in the gang and enhancing the gang's status and ability to intimidate residents of the neighborhood.

The jury found the gang allegation true for both counts of shooting an inhabited dwelling — that is, both for shooting at Jack's house and for shooting at the house next door with the

barking dogs.[3]  On each count Renteria received a sentence of three years under Penal Code section 246 and was subject to a 15-year-to-life gang penalty under Penal Code section 186.22, subdivision (b)(4)(B).[4]  The gang penalty in turn rendered Renteria eligible for a 20-year sentence enhancement for personally and intentionally discharging a firearm in the commission of a felony punishable by life imprisonment.  (See Pen. Code, § 12022.53, subds. (a)(17), (c).)  The court sentenced Renteria to two consecutive terms of 23 years to life.

On appeal, Renteria argued, among other things, that there was insufficient evidence to support the gang allegations. A divided Court of Appeal rejected this challenge and affirmed the gang penalties.  (*People v. Renteria* (Jan. 5, 2021, F076973) [nonpub. opn.].)  Although the majority opinion noted that an unidentified companion may have been with Renteria at the time of the shootings, the court assumed that Renteria was not acting in association with or at the direction of another gang member.  The court nonetheless determined there was sufficient evidence to satisfy both prongs of the gang enhancement

---

[3]  The prosecution also charged Renteria with grossly negligent discharge of a firearm for an incident that occurred the previous evening, but the jury acquitted Renteria on this count.

[4]  "As we have previously explained, a sentence enhancement adds ' "an additional term of imprisonment to the base term," ' while an alternate penalty like section 186.22(b)(4) ' "provides for an alternate sentence when it is proven that the underlying offense has been committed for the benefit of, or in association with, a criminal street gang." ' [Citation.]  Both types of provisions differ from substantive offenses in that they do not ' "define or set forth elements of a new crime." ' " (*People v. Lopez* (2022) 12 Cal.5th 957, 962, fn. 4.)

statute, Penal Code section 186.22, subdivision (b) (section 186.22(b)).[5]

As evidence the shootings were committed "for the benefit" of the Sureño gang (§ 186.22(b)), the court cited Officer Adney's testimony that the shootings would benefit the gang, even if the shootings had not been committed against rival gang members. It further cited evidence that Jack's house had "at least some link to Norteños, even if it was not a hotbed of rival gang activity"; Renteria's statement to Officer Adney that he thought he had been " 'hit up' " by Northerners; and Anthony's testimony that he was tired of " 'issues' " in the neighborhood.

As for Renteria's "intent to promote, further, or assist" the "criminal conduct by gang members" (§ 186.22(b)), the court cited *People v. Hill* (2006) 142 Cal.App.4th 770, 774 for the proposition that Renteria's intent to promote his own criminal conduct, in the form of the current offenses, sufficed. But acknowledging another court's admonition that the charged

---

[5] The alternate penalty provision that applied to Renteria, section 186.22(b)(4), provides for an indeterminate life term for particular enumerated felonies, including shooting at an inhabited dwelling. Section 186.22(b)(1) applies to other felonies and imposes a sentence enhancement of lesser, determinate terms. Both subdivisions, however, contain the identically worded requirement that the felony be committed for the benefit of the gang and to promote the criminal conduct of its members. We therefore use the shorthand "section 186.22(b)" or "gang enhancement statute" in discussing the felony requirements at issue here and refer to those requirements generally as "enhancement provisions."

Assembly Bill No. 333 (2021–2022 Reg. Sess.) has since amended some of these requirements. (See fn. 6, *post*.) Unless otherwise noted, we refer to the law as it existed at the time of Renteria's conviction.

offense and gang membership alone are insufficient to satisfy this aspect of the gang enhancement statute, the court went on to explain why the evidence showed more than that. The court cited Officer Adney's testimony that a Sureño who is a victim of a crime is required to respond; that "[s]howing one is willing to put in work for the gang and be violent elevates that person's status within the gang and the status of the gang as a whole"; and "[i]ntimidation of witnesses and the community increases the gang's control of territory." Here, the court reasoned, a reasonable jury could infer that Renteria intended for the shootings to intimidate rival gang members and neighborhood residents, "thus facilitating future crimes committed by himself and his fellow gang members." A jury could also infer that shooting Jack's house was retaliation for getting " 'hit up,' " and was meant "as a means of recouping respect" for Renteria and for the gang. Finally, the jury could conclude that Renteria shot at the house next door to intimidate possible witnesses, quiet the dogs, and facilitate escape, "thereby furthering his gang's reputation and control of contested territory, and his own gang-motivated criminal conduct."

Justice Smith wrote a partial dissent. (*People v. Renteria, supra*, F076973 (conc. & dis. opn. of Smith, J.).) Justice Smith noted, among other things, that the record did not support the conclusion that the shooter had shouted "Sur trece" at the time of the shooting. It was, however, based on that incorrect assumption that Officer Adney opined that the shootings benefited the Sureño gang. Without that unsupported assumption, Justice Smith concluded, Adney's opinion was "ultimately irrelevant and of no help to the jury," leaving insufficient evidence to support the gang penalties.

After we granted review in this case, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.), which narrowed the scope of section 186.22(b) enhancement provisions in several respects. (Assem. Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333); see Stats. 2021, ch. 699, § 3.)[6] Although the

---

[6] Assembly Bill 333 has made several noteworthy changes to the law governing gang enhancements and penalties. First, Assembly Bill 333 "narrows the definition of ' "criminal street gang" ' to 'an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity.' (Assem. Bill 333, § 3; [Pen. Code,] § 186.22, subd. (f), [as amended by Stats. 2021, ch. 699, § 3,] eff. Jan. 1, 2022, italics added.)" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) Assembly Bill 333 also increases the prosecution's burden of proof by "alter[ing] the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang." (*Lopez*, at p. 345; see Pen. Code, § 186.22, subd. (e), as amended by Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.) Among other things, Assembly Bill 333 requires that the predicate offenses used to demonstrate a pattern of criminal gang activity must have " 'commonly benefited a criminal street gang' " where the " 'common benefit . . . is more than reputational.' " (*Lopez*, at p. 345; see Pen. Code, § 186.22, subd. (e)(1), as amended by Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.)

As particularly relevant to the issues addressed in this opinion, Assembly Bill 333 also includes a provision stating that, as used in the Street Terrorism Enforcement and Prevention Act (Pen. Code, § 186.20 et seq.), "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may

---

parties agree Assembly Bill 333 applies retroactively to nonfinal cases, they disagree about the effect of Assembly Bill 333 on the gang penalties imposed on Renteria in this matter.  We do not resolve this dispute because we conclude the evidence was not sufficient to sustain the gang penalties even under the law in effect at the time of Renteria's trial.

## II.

The gang enhancement statute was enacted in 1988 as part of the Street Terrorism Enforcement and Prevention Act (STEP Act, or Act).  (Pen. Code, § 186.20 et seq.; see *People v. Gardeley* (1996) 14 Cal.4th 605, 609.)   Finding that crimes committed by members of violent street gangs "present a clear and present danger to public order and safety," the Legislature aimed to eradicate criminal gang activity "by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs."  (Pen. Code, § 186.21.)

The gang enhancement provisions provide one of two primary means by which the STEP Act punishes criminal gang activity.   The first, codified in Penal Code section 186.22, subdivision (a) (section 186.22(a)), consists of "a substantive

include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."   (Pen. Code, § 186.22, subd. (g), as amended by Stats. 2021, ch. 699, § 3,  eff. Jan. 1, 2022.)

Because of our resolution of the case, we do not here address any question about the effect of these amendments on Renteria's sufficiency of the evidence challenge; we instead focus on the law as it existed before the enactment of Assembly Bill 333.

offense" punishing " '[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . .' " (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (plur. opn.) (*Rodriguez*), quoting § 186.22(a).) The gang enhancement provisions, by contrast, codified in section 186.22(b), prescribe sentence enhancements or alternate penalties of varying length for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1); see *id.*, subd. (b)(4).)

The substantive offense and enhancement provisions "strike at different things." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138 (plur. opn.).) "[W]ith section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang related." (*Rodriguez*, at p. 1138, citing *People v. Albillar* (2010) 51 Cal.4th 47, 55 (*Albillar*).) Thus, as we held in *Rodriguez*, section 186.22(a) does not reach the conduct of a gang member acting alone. (*Rodriguez*, at p. 1132.) The enhancements provisions prescribed by section 186.22(b) are, by contrast, designed to punish "gang-related conduct." (*Rodriguez*, at p. 1138.) The Courts of Appeal have uniformly held, and the parties here agree, this includes the gang-related conduct of an individual who acts alone. (See *id.* at pp. 1138–1139 (plur. opn.); *id.* at pp. 1140–1141 (conc. opn. of Baxter, J.); *People v. Rios* (2013) 222 Cal.App.4th 542, 546; *People v. Soriano* (2021) 65 Cal.App.5th 278, 285.)

Our prior cases addressing the gang enhancement statute for the most part have concerned the conduct of individuals acting in concert with other gang members, however. (E.g., *Albillar*, *supra*, 51 Cal.4th at p. 61; *People v. Gardeley*, *supra*, 14 Cal.4th at p. 619.) The distinction is important, because, as we recognized in *Albillar*, the joint nature of the alleged conduct frequently affects the type of evidentiary showing that is sufficient to demonstrate the conduct was gang-related and committed to promote the criminal activity of gang members, as section 186.22 requires.

The question in *Albillar* concerned the sufficiency of the evidence supporting gang enhancements for a forcible rape and other sex offenses perpetrated by gang members acting in concert. Upholding the enhanced sentences, we explained that the Legislature required the underlying felony be committed for the benefit of, at the direction of, or in association with a criminal street gang "to make it 'clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is "gang related." ' [Citation.] Not every crime committed by gang members is related to a gang. These crimes, though, were gang related in two ways: they were committed in association with the gang, and they were committed for the benefit of the gang." (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Where three members of the same gang "actively assisted each other" and, because of their common gang membership, "could rely on each other's cooperation in committing these crimes," there was sufficient evidence of both association and benefit — in particular, that the gang members "would benefit from committing [the crimes] together." (*Id.* at p. 62.) On the latter point concerning benefit, we also cited expert testimony that the crimes bolstered the gang's reputation as a violent, aggressive

gang. (*Id.* at pp. 62–63.) We explained that "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*Albillar*, at p. 63.)

As for the second requirement of the enhancement, we said that when the evidence "establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.)

*Albillar* thus established that in cases where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activity of other gang members, in connection with the very same criminal offense. (*Albillar*, *supra*, 51 Cal.4th at pp. 60, 68.) But for reasons *Albillar* makes clear, cases involving lone actors pose different problems. Where there is no proof the defendant acted in association with or at the direction of the gang, the prosecution cannot rely on the joint nature of the offense to establish either the requisite benefit to the gang or the specific intent to promote the criminal activity of gang members. In a lone-actor case, a different showing is necessary to satisfy these requirements.

## III.

## A.

In considering the nature of that showing, we start with the text. Section 186.22(b) sets out what is, in effect, a two-pronged requirement: the felony must be committed (1) for the benefit of, at the direction of, or in association with a criminal street gang, and (2) with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22(b)(1), (4); *Albillar, supra,* 51 Cal.4th at pp. 51, 68.)[7]

We interpret this two-pronged requirement in light of the constitutional backdrop against which it was enacted. Decades before the STEP Act, the United States Supreme Court explained in *Scales v. United States* (1961) 367 U.S. 203 (*Scales*) that the Constitution limits the state's power to criminalize membership in particular groups, including groups that engage in illegal activities. As *Scales* put it: "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the

---

[7] The prosecution must also prove that the gang in question is a "criminal street gang" within the meaning of the STEP Act. At the time of the offenses at issue, the statute defined the term "criminal street gang" to mean " 'an[y] ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.' " (*People v. Lopez, supra,* 73 Cal.App.5th at p. 344, italics omitted.) As noted previously, Assembly Bill 333 has since narrowed the scope of this requirement. (See fn. 6, *ante.*)

relationship of that status or conduct to other concededly criminal activity . . . , that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." (*Scales*, at pp. 224–225.)

The Legislature was aware of *Scales* when it was drafting the STEP Act. (See *People v. Castenada* (2000) 23 Cal.4th 743, 749.) And with *Scales* in mind, the Legislature wrote section 186.22(b) in a manner designed to avoid imposing additional punishment for a given felony based on "mere gang membership." (*People v. Gardeley, supra*, 14 Cal.4th at p. 623.) Rather, the Legislature imposed requirements intended to "provide a nexus to gang activity sufficient to alleviate due process concerns." (*Rodriguez, supra*, 55 Cal.4th at p. 1139 (plur. opn.).)

In cases involving joint activity, the required nexus is generally shown by proof of criminal conduct undertaken in concert with other gang members. (E.g., *People v. Castaneda, supra*, 23 Cal.4th at pp. 750–751.) But in a case involving a lone actor, operation of the statute turns, at bottom, on the nature of the individual's actions and reasons for committing the underlying felony. Specifically, the statute requires proof that the defendant committed the underlying felony (1) for the benefit of the gang, and (2) with specific intent to promote, further, or assist the criminal conduct of gang members. Insofar as the statute "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang," it satisfies the "constitutional requirement of personal guilt." (*Albillar, supra*, 51 Cal.4th at pp. 68, 67.)

Two features of the intent requirement are particularly relevant in lone-actor prosecutions. First, the specific intent to aid the criminal activities of a gang's members implies knowledge of the nature of at least some of those activities. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1131 ["One cannot intend to help someone do something without knowing what that person meant to do"]; see also *People v. Beeman* (1984) 35 Cal.3d 547, 558 [to establish " ' "guilty knowledge and intent" ' " with regard to another's criminal conduct, the defendant must know "the perpetrator's criminal purpose" and "*at least realize* he or she is aiding" in the conduct].) As *Scales* holds, due process requires there be a significant connection between the defendant's "guilty knowledge and intent" and the criminal conduct of the defendant's associates — that is, "concrete" and "practical" encouragement of "specifically illegal activities." (*Scales*, *supra*, 367 U.S. at p. 227.) Reading the statute against this backdrop, we infer that to satisfy the second prong of the statute, a defendant facing sentence enhancement allegations for a gang-related felony under section 186.22(b) must at least be aware of the type of criminal activity the gang members pursue; without such awareness, the defendant cannot intend to aid in such activity.

Second, the statute refers to the intent to promote "criminal conduct by gang *members*" (§ 186.22(b)(1), (4), italics added), the most natural reading of which means the promotion of criminal conduct by more than one member of the gang (cf. *Rodriguez*, *supra*, 55 Cal.4th at p. 1133 (plur. opn.) [giving meaning to the plural use of "members" in section 186.22(a)]) — which, in a lone-actor case, necessarily means the promotion of conduct other than the commission of the underlying felony. This is not to suggest that a defendant's current offense is

always out of bounds; in *Albillar* we stated that the gang enhancement statute does not require that " ' "criminal conduct by gang members" be distinct from the charged offense.' " (*Albillar*, *supra*, 51 Cal.4th at p. 66.) There, however, we addressed a context in which three gang members acted together; the charged offenses thus already involved each defendant assisting the criminal conduct of the other two gang members. But where, as here, the defendant acts alone, the criminal conduct of multiple gang members is not at issue. Because the showing of intent must include the intent to promote criminal activity by others, in a lone-actor case this necessarily means an intent to promote criminal activity other than the charged offense.[8]

## B.

To establish the requisite intent in a lone-actor case, the prosecution has often relied on expert opinion about the potential for a gang member's crime to benefit the gang by, among other things, enhancing a gang's reputation for violence among rival gangs or in the community more generally. The prosecution has typically asked the jury to infer that the defendant committed the underlying felony in order to reap that reputational benefit, and, by enhancing the gang's reputation, to facilitate members' future crimes.

This approach is not without basis in case law: We cited similar expert opinion in *Albillar* to support our conclusion that the concerted actions of gang members in that case conferred a benefit to the gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63.)

---

[8]    We disapprove *People v. Hill*, *supra*, 142 Cal.App.4th 770, to the extent it is inconsistent with this understanding. (See *id.* at p. 774.)

Assembly Bill 333 has since placed clear limits on this approach by requiring a cognizable "benefit" to be more than purely reputational. (See fn. 6, *ante*.) But even setting these statutory changes to one side, there have always been limits to what expert testimony could show about a defendant's reasons for committing a crime. Without more, generalized expert opinion that commission of a particular crime enhances the gang's power in the community by increasing its reputation for violence falls short for at least two reasons.

First, this sort of expert opinion proves too much. If generalized testimony about the reputational benefits of a defendant's violent crime were, standing alone, sufficient to support an inference that the defendant committed the crime for the benefit of the gang, with specific intent to promote, further, or assist its members' crimes, it would mean that essentially every violent crime committed by a gang member could be punished more severely under section 186.22(b) purely because of the defendant's gang membership. But "our STEP Act does not criminalize mere gang membership," nor does it impose additional punishment on individuals merely because they happened to belong to a gang when they committed a crime. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 623.) As we have explained above, any other understanding of the reach of the STEP Act would raise significant constitutional concerns the Legislature consciously sought to avoid. Thus, to "provide a nexus to gang activity sufficient to alleviate due process concerns" (*Rodriguez*, *supra*, 55 Cal.4th at p. 1139 (plur. opn.)), the statute requires a closer connection between the defendant's crime and the conduct of the gang and its members than generalized community reputation testimony can provide.

Second, describing a benefit to the gang is only part of the equation; the prosecution must also establish that the defendant committed the underlying felony with the specific intent to promote, further, or assist criminal conduct by other gang members — a requirement we have described as knowledge of at least some of the criminal activities of the gang and its members and intent to further those activities.  Without more, evidence that committing a violent crime can enhance the gang's reputation for viciousness in the community does not support an inference that the defendant committed a particular violent crime for the benefit of the gang and with the intent to facilitate known criminal activity by other gang members.

None of this is to suggest that prosecutors may not rely on expert opinion to connect the defendant's crime with the conduct of the gang and its members; to the contrary, we have previously held that " '[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) But important limitations apply to the use of such testimony. Expert opinion, typically guided by hypothetical questions, " 'must be rooted in facts shown by the evidence.' "  (*Id.* at p. 1045.)  They " 'may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' " (*Id.* at p. 1046.)

The appellate case law offers guidance about how to ensure that expert reputation testimony is linked by specific evidence, rather than speculation or conjecture, to a defendant's gang-related goals in committing a particular crime. *People v. Ochoa* (2009) 179 Cal.App.4th 650 is instructive.  There, in a case involving a carjacking, the expert testified that carjacking

was a " 'signature' " crime of gangs generally, and its commission in that case would elevate the reputation of the defendant's gang. (*Id.* at p. 655; *id.* at p. 656.) The Court of Appeal concluded the expert opinion was based on speculation, however, finding no evidence the defendant engaged in a distinctive carjacking style that could be attributed to his gang; no evidence the defendant made his gang affiliation known or later took credit for the crime; no evidence the victim was a gang member or rival; and no evidence the defendant's purpose involved retaliation for past gang activity. (*Id.* at pp. 662–663.) Across cases, appellate courts have relied on similar factors — whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime — to describe the limits of reputation evidence and ensure that it is grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons. (E.g., *People v. Soriano, supra*, 65 Cal.App.5th at p. 289; *People v. Perez* (2017) 18 Cal.App.5th 598, 609; *People v. Ramirez* (2016) 244 Cal.App.4th 800, 819; *People v. Rios, supra*, 222 Cal.App.4th at p. 573.)[9]

---

[9] Some courts have noted that a defendant's presence in gang territory may be relevant to determining whether a crime was gang-related. (E.g., *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199; *People v. Ochoa, supra*, 179 Cal.App.4th at p. 662; *People v. Rios, supra*, 222 Cal.App.4th at p. 574; *People v. Perez, supra*, 18 Cal.App.5th at p. 609.) Such evidence should be approached with caution, however; it may not be "particularly probative" when, for example, the territory in question is also where the defendant lives. (*People v. Soriano, supra*, 65 Cal.App.5th at p. 289.)

Some appellate courts have discerned in *Albillar* a broader authorization to rely on generalized reputation testimony. This overreads our opinion in that case; *Albillar* is best understood in light of its particular factual context.

We did state in *Albillar* that "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang.'" (*Albillar, supra,* 51 Cal.4th at p. 63.) But the showing in that case included evidence that three gang members together raped a young woman in an apartment "'saturated'" with their gang paraphernalia (*id.* at p. 62) and then attempted to leverage their violence and gang membership when threatening the victim to stop her from reporting their crimes (*id.* at p. 53). Unlike expert testimony about the reputational benefits of crime in general, the evidence in *Albillar* demonstrated a connection between the gang's reputation for viciousness and the specific ways the gang benefited from that reputation, namely, the intimidation of specific, identifiable witnesses and the possibility that gang members might avoid prosecution or conviction for their crimes. And *Albillar* also highlighted the benefit the gang members derived from acting together (*id.* at p. 62), indicating that evidence supporting the associational element of the statute provided further circumstantial evidence of a benefit to the gang. *Albillar* therefore did not present a situation in which reputation evidence alone satisfied the gang enhancement statute in a case involving a felony committed by a lone actor, or where the jury was left to speculate about the target of the intimidation by the gang members or what criminal activity the gang members intended to facilitate.

Nor do our other cases offer such authorization. In *Gardeley*, we found evidence supporting the section 186.22(b) enhancement sufficient when expert testimony provided a link between the crime committed and intimidation that was relevant to specific gang activities. There, gang members assaulted a stranger who entered an area where they were selling cocaine; expert testimony established that the gang's primary purpose was to sell narcotics and that such violent assaults intimidated residents in the gang's territory, allowing its members to maintain their drug-dealing stronghold. (*People v. Gardeley*, *supra*, 14 Cal.4th at pp. 612–613, 619.)

And in *People v. Rivera* (2019) 7 Cal.5th 306, we found evidence sufficient to establish "that Rivera specifically intended the murder [of a police officer] to benefit and promote the gang" when it showed that Rivera was an active gang member, that he participated in and pleaded guilty to offenses related to the gang's drug trade, that the officer killed had been leading an investigation of the gang's drug trade, and that the officer had questioned Rivera and searched his home regarding the investigation. (*Id.* at p. 332; see *id.* at pp. 331–332.) These facts not only connected Rivera's actions to the criminal activities of his gang and its members but also suggested "substantial participation" in those activities that would support an inference of knowledge and intent to facilitate them through the killing of the investigating officer. (*People v. Johnson* (2016) 62 Cal.4th 600, 630.)

In the end, any inference that might otherwise be drawn from testimony that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness" (*Albillar*, *supra*, 51 Cal.4th at p. 63) must be cabined so that section 186.22(b) prosecutions avoid punishing mere gang membership,

as opposed to gang-related conduct. In a case involving a gang member who has acted alone in the commission of a felony, there must be evidence connecting testimony about any general reputational advantage that might accrue to the gang because of its members' crimes to the defendant's commission of a crime on a particular occasion for the benefit of the gang, and with the specific intent to promote criminal activities by the gang's members.

## IV.

With all this in mind, we turn to the specifics of Renteria's challenge to the imposition of gang penalties for shooting at two inhabited dwellings. "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*Albillar*, *supra*, 51 Cal.4th at pp. 59–60.)

As this guidance indicates, and as we reiterated recently, sufficiency determinations necessarily take account of the "standard of proof that applied before the trial court" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008); that is why

in criminal cases we must ensure the record demonstrates substantial evidence to establish guilt beyond a reasonable doubt (*ibid.*; see also *People v. Soriano, supra*, 65 Cal.App.5th at p. 281 [reiterating the standard of proof in reviewing sufficiency of gang enhancement evidence]).

This was a lone-actor case. True, as the Court of Appeal stated, "[i]t is not altogether certain defendant acted alone." (*People v. Renteria, supra*, F076973.) The evidence did indicate that someone was with Renteria when he shot at Jack D.'s house. But it did not establish who that person was or whether he or she was a gang member. The record therefore lacks substantial evidence that Renteria acted with another gang member in committing these offenses. So we proceed, for purposes of analyzing the sufficiency of the evidence, on the premise that Renteria acted alone.[10]

In finding sufficient evidence to support the gang penalties, the Court of Appeal concluded that Renteria's actions intimidated the community in a way that both benefited his gang and demonstrated his intent to promote his own future criminal activity and that of other gang members. The court stated that Renteria's shootings intimidated rival gang members and neighborhood residents, increased his gang's control of contested territory, and therefore facilitated future crimes that he and his fellow gang members would commit. (*People v. Renteria, supra*, F076973.) The Attorney General

---

[10] At oral argument, the Attorney General suggested for the first time that this case might not be a lone-actor case if Renteria were acting according to an official gang "policy." In those circumstances, the argument goes, the actions would be "at the direction of" the gang. We do not consider this belatedly raised possibility and so express no views on the merit of the argument.

similarly argues that intimidating witnesses and rivals established Renteria's intent to facilitate future criminal conduct by other gang members. And at trial, the gang expert testified that the Sureño gang benefited from violence by its members because the violence intimidated witnesses and allowed gang members to continue their "day-to-day gang activity."

The first and most fundamental difficulty with prosecution's case is that no substantial evidence shows that Renteria intended his actions to be attributed to his gang. The Attorney General points to evidence that, at some point on the night of the shootings, Renteria associated with a group that shouted out "Sur trece," a gang slogan. But the description of events did not provide substantial evidence that this happened especially close in time to the shootings, and the record does not support the inference that, by walking along with the group earlier in the night, Renteria intended the later shootings to be attributed to the gang. Although the parties dispute the timing of events, the evidence shows that the group dispersed and, according to Anthony A., it was "a little while" later when Renteria returned and shot at the houses. When questioned by Anthony, Renteria minimized and distanced himself from the shouting, suggesting those involved were drunk and he was just helping them home. There was no evidence that Renteria identified himself or his gang during the shooting or took credit for it on behalf of his gang afterwards.

Nor does the record support a conclusion that Renteria could have reasonably anticipated the community would perceive a gang connection. No witnesses testified that they believed the shootings were related to a Sureño gang or gang rivalry, or that they feared Sureño gang activity. When the

prosecutor asked one neighbor if he worried about testifying or feared for his family because of his role in the case, the witness denied such concerns; another neighbor testified that she was frightened by the shooting but did not connect it to gang activity, much less to Renteria's gang. Jack D. did not attribute the shooting of his house to gang activity either; he testified that he had not even been aware of it. And Anthony testified that he understood Renteria's companions to be shouting "slang gang words" earlier in the evening, but gave no indication he thought Renteria himself was a Sureño gang member or that he believed the shootings were related to a Sureño cause.

Equally important, no substantial evidence in the record supports the Attorney General's claim that Renteria intended the shooting to contribute to his gang's rivalry with Northerners. The Attorney General argues the evidence reasonably allowed the jury to infer that Renteria shot at Jack D.'s house for the benefit of his gang because he was retaliating for being " 'hit up' " earlier the same evening. The record demonstrates that Renteria had been challenged by people he assumed were Northerners; he believed they had a shotgun and ran from them. Police later found a shotgun in Jack's closed garage that would not have been visible to Renteria. Officer Adney also testified that in the past, he had seen Robert P., who was "associated" with Jack's home (but did not live with Jack), in the presence of Norteño gang members. The Court of Appeal noted that "there was evidence Jack D.'s house had at least some link to Norteños, even if it was not a hotbed of rival gang activity." (*People v. Renteria, supra,* F076973.) But the shotgun and a vague reference to Robert does not amount to substantial evidence from which the jury could conclude beyond a reasonable doubt that shooting at Jack's

25

house was a retaliation carried out to benefit Renteria's gang, or that it would have been so understood by anyone in a position to know about the shooting. To the extent Officer Adney testified that Renteria may have engaged in the shooting to maintain *his own* respect within the gang, such evidence fails to explain how enhancing his personal reputation within the gang would facilitate the criminal activities of the gang and its members, as section 186.22(b) requires.[11]

Finally, we see no other evidence from which the jury could infer that Renteria knew of and thus might have intended to promote the criminal activities of his gang's members. Renteria admitted being a Sureño when he was in middle school and a few years later police detained him at an abandoned house that had been spray painted with gang-related graffiti. Renteria again admitted being a Sureño when he was arrested for the current charges, but the prosecutor offered no evidence to show the degree of Renteria's involvement with the gang, to otherwise suggest his familiarity with the criminal activities of the gang's members, or to identify the criminal conduct Renteria's actions might have facilitated. (Cf. *Albillar*, *supra*, 51 Cal.4th at p. 62 [evidence that defendants had large gang tattoos on their torso, neck, and face and lived in an apartment " 'saturated' with gang paraphernalia" showed their relationship with the gang was

---

[11]   The Attorney General concedes that Renteria's motivation for shooting at the second house was unrelated to retaliation but argues that it contributed to the violent reputation of his gang. As we have discussed, however, there was no evidence the victims or other community or gang members perceived a connection between Renteria's actions and his gang, such that Renteria's gang might have stood to benefit in this way. Nor was there evidence that Renteria intended to facilitate known criminal activity by other gang members.

more than " 'superficial' "]; *People v. Rivera, supra,* 7 Cal.5th at p. 331 [charged crimes involved defense of drug dealing territory and the defendant had previously pleaded guilty to offenses related to his gang's drug trade]; *People v. Sanchez* (2016) 63 Cal.4th 665, 699 [evidence of the defendant's prior law enforcement contacts "bolstered the prosecution's theory that he acted with intent to benefit his gang"].)

In sum, considering the record as a whole, we conclude there was not sufficient evidence to support either prong of the gang enhancement statute, with respect to either shooting. The evidence at trial demonstrated that Renteria was a gang member at the time of the shootings. But the evidence did not support the inference that Renteria committed the shootings for the gang's benefit, with the specific intent to promote the criminal activities of gang members, as opposed to acting for his own, personal reasons. Thus, while Renteria is undisputedly subject to punishment for the unlawful shootings, he is not subject to the additional punishment prescribed for felonies that have been shown to be gang-related under section 186.22(b).

## DISPOSITION

We reverse the judgment of the Court of Appeal insofar as it upheld the imposition of the section 186.22(b)(4) penalties, with directions to remand the case to the trial court for resentencing in accordance with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Renteria

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 1/5/21 – 5th Dist.
**Rehearing Granted**

_____

**Opinion No.** S266854
**Date Filed:** August 25, 2022

_____

**Court:**  Superior
**County:**  Tulare
**Judge:**  Kathryn T. Montejano

_____

**Counsel:**

James Bisnow, under appointment by the Supreme Court, for Defendant and Appellant.

Mary K. McComb, State Public Defender, Hassan Gorguinpour and Alyssa Mellott, Deputy State Public Defenders, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Darren K. Indermill, Rachelle A. Newcomb, Cavan M. Cox II and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James Bisnow
117 East Colorado Boulevard, Suite 600
Pasadena, CA 91105
(626) 229-9665

Lewis A. Martinez
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 705-2308

Alyssa Mellott
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94602
(510) 267-3300