Filed 7/1/24  P. v. Stringer CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328976 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA331910) |
| v. | |
| JONZEL STRINGER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Elizabeth Richardson-Royer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General for Plaintiff and Respondent.

_____

In 2010, a jury convicted Jonzel Stringer of two counts of second degree murder and 46 counts of attempted murder. The jury further found that a principal in the commission of the crime was armed with a firearm. The court sentenced him to 198 years to life in prison. After we reversed the attempted murder convictions on his direct appeal in 2012, the court resentenced Stringer to 15 years to life on the murder convictions plus three years on the principal armed enhancements.

In 2019, Stringer petitioned the court to be resentenced under the predecessor to Penal Code section 1172.6.[1] After an evidentiary hearing, the court found Stringer guilty of two counts of second degree murder on alternative grounds: (1) that he was a direct perpetrator of the two murders; and (2) that he acted with implied malice in directly aiding and abetting his accomplice, Izac McCloud.

Stringer contends: (1) The court failed to consider the element of causation in determining that he was a direct perpetrator of the murders; (2) The evidence is insufficient to support the court's findings on certain elements of the crimes; and (3) The court failed to consider his youth in determining whether he acted with the requisite mental state.

We conclude that the court's finding that Stringer is liable for murder as a direct aider and abettor of the murders committed by McCloud is supported by substantial evidence. We also conclude that Stringer forfeited the argument that the court failed to consider his youth and, if not forfeited, we reject it as inadequately developed or supported. We therefore affirm the judgment.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

# FACTUAL SUMMARY

On the afternoon of January 19, 2008, Stringer, McCloud, and K.L. were at L.L.'s house. McCloud and Stringer talked about going to a party that evening. L.L. told them they should not go because "bad things happen when you go where you ain't supposed to be." McCloud said they "should . . . bring a 22 or a bigger gun" to the party. A friend of McCloud and Stringer, who L.L. knew as "Black-T," arrived at the house. Black-T showed the others a semiautomatic handgun he had brought with him. According to L.L., it was a "9, similar to a Glock." Upon seeing the gun, Stringer said to McCloud and K.L., "We can use that" for "protection" at the party and told McCloud to get the gun from Black-T. Black-T agreed to let them have it.

That evening, Stringer drove McCloud to a birthday party for teenage twins R.H. and C.H. (the twins) at the Masonic Lodge in Long Beach. The twins' father anticipated that 80 to 100 people would attend. Instead, "hundreds" of people showed up. Witnesses described the lodge as being "packed" "[e]lbow-to-elbow," and "[w]all-to-wall people." Many more—including Stringer and McCloud—were in the parking lot or waiting in a long line of people to get inside.

At some point, a scuffle or fight broke out inside the lodge. The twins' father believed the situation had become uncontrollable and decided to shut the party down. Before he could do so, however, gunshots were fired and a window to the lodge shattered. Different bullets hit Dennis Moses and Breon Taylor, who were inside the lodge. They died as a result of bullet wounds to the head. A third bullet hit R.G. in the leg. R.G., who was also inside the lodge when he was hit, survived.

Later that night, Stringer returned to L.L.'s house. According to L.L.'s trial testimony, Stringer seemed "nervous" and "scared" and kept walking in circles and saying, "I didn't do it." Once Stringer calmed down, he told L.L. that he and McCloud drove to the party, Stringer "walked up to the door to go in, and they socked him in the face." Stringer said he ran back to the car and told McCloud, " '[G]et 'em, get 'em, get 'em.' " Stringer told L.L. he got the gun from McCloud, fired two shots "aiming towards the party" or "[a]t the party," and then handed the gun back to McCloud, who fired six more shots. Stringer then drove them away from the scene.[2]

When L.L. was asked at trial what Stringer was referring to when he initially said he "didn't do it," L.L. said that Stringer was not the one who shot the victims; McCloud shot them.

Investigating police officers found 10 nine-millimeter shell casings in the parking lot outside the lodge. They found no evidence that shots were fired inside the lodge. After examining the casings, a police criminalist determined that the bullet casings were all fired from the same weapon.

The criminalist concluded that the bullets recovered from victims Moses, Taylor, and R.G. were all fired from a nine-millimeter semiautomatic firearm, and that the bullets recovered from Moses and Taylor were fired from the same firearm. The bullet recovered from R.G. was "more likely than not" fired from

---

[2] On cross-examination, Stringer's counsel introduced evidence of L.L.'s prior statements to detectives that did not identify Stringer as a shooter. At one point, a detective asked L.L.: "Did he [Stringer] say who was shooting?" to which L.L. answered: "No, but I think he was trying to say it was Izac [McCloud]."

the same firearm as the bullets recovered from Moses and Taylor. The gun was never found.

The criminalist observed "pitting marks" and a "glistening powdery substance" on the surface of the bullets recovered from R.G.'s leg and the bodies of Moses and Taylor. According to the criminalist, these marks and substance indicated that the bullets had passed through glass before hitting the victims.

In addition to the three bullets that hit the victims, investigating officers identified five bullet strike marks on the exterior wall of the lodge near the shattered window and two bullet holes in a car in the parking lot near the entrance to the lodge. Ten hits equal the maximum number of bullets that can be held in the kind of magazine that "the public is allowed to buy" for a nine-millimeter handgun.

Two days after the shooting, P.A.—a student at the same high school McCloud attended—talked to Marcus Egland, a gang intervention specialist at the school. P.A. told Egland that he "was there when everything happened," that he saw "the actual shooting," and "knows who did the shooting." In talking to Egland, P.A. referred to Stringer as "JP." Egland testified that P.A. told him that McCloud and Stringer became upset when they were not allowed into the party, and that Stringer told McCloud "to go to the car and get the gun out and end it," i.e., "[e]nd the party." P.A. told Egland that Stringer "instructed" McCloud to "shoot it up in the air. Just scare 'em." McCloud then started shooting into the party.

In an audiotaped interview on February 4, 2008, P.A. told police a version of events that was generally consistent with Egland's testimony: There was some sort of fight at the party; McCloud went to a beige car and got a gun from inside the car;

a companion of McCloud's told McCloud to "[e]nd the party" and " 'shoot it in the air' "; McCloud then "shot at the window," paused, and fired two shots in the air.[3]  McCloud and the companion then left in the beige car.

Detectives showed P.A. a picture of a beige Buick Regal that was registered to Stringer's mother.  P.A. told the detectives that it looked like the car in which McCloud and the driver left the scene after the shooting.

About a week after the shooting, Stringer talked to his cousin about the incident.  Stringer told his cousin that he was at a party and "his homeboy got into it with somebody, and the homeboy shot him and they just left."  Stringer's cousin asked about the gun, and Stringer told him that "the guy got rid of that."

Other accounts of the incident varied widely.  Although many witnesses testified that the shots were fired from outside the lodge, some said they saw or believed someone fired a gun from inside the lodge and others described gunfire without saying from where it had come.  Witnesses also gave different descriptions of the clothes and hair color of the shooter.

Testimony as to the number of shots witnesses heard ranged from three to twenty.  Some witnesses described a single

---

[3] P.A.'s statements in police interviews and his testimony before a grand jury were not all consistent, and he admitted having given incorrect information to the police at various times. During trial, P.A. answered, "I don't remember" to nearly every question asked, and he specifically denied having told the police the identity of the shooter.  The recording of the February 4, 2008 interview was then played for the jury.

series of gunshots; and others described two or three series of gunshots separated by a pause or pauses.

## PROCEDURAL HISTORY

In 2010, a grand jury charged Stringer and McCloud with the murders of Moses and Taylor (§ 187), the attempted murder of R.G. (§§ 187, 664), and the attempted murder of 59 others. The indictment further alleged certain firearm enhancements as to each crime (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (c) & (d)), and the multiple murder special circumstance (§ 190.2, subd. (a)(3)). Pursuant to section 1385, the trial court dismissed 12 of the attempted murder counts prior to trial and, later, pursuant to section 1118.1, dismissed two attempted murder counts.

Stringer and McCloud were tried together before different juries. Stringer's jury was instructed, among other theories, on felony murder and aiding and abetting liability under the natural and probable consequences doctrine.

Stringer's jury convicted him of two counts of second degree murder and all 46 remaining counts of attempted murder. The jury also found the firearm enhancement allegations true. The court sentenced Stringer to prison for 198 years to life.

In 2012, we affirmed Stringer's murder convictions and reversed the attempted murder convictions in a partially published opinion. (*People v. McCloud* (2012) 211 Cal.App.4th 788.) After remand, the prosecution elected not to retry the attempted murder charges. The court resentenced Stringer to 15 years to life plus three years for the firearm enhancement on each of the murder convictions.

In 2019, Stringer petitioned the superior court to be resentenced under section 1172.6. The court found that Stringer

7

had made a prima facie showing for relief and, on December 21, 2022, held an evidentiary hearing pursuant to subdivision (d)(3) of section 1172.6.  The hearing was held before the same judge that presided over Stringer's 2010 trial.  The prosecution introduced the reporter's transcripts from Stringer's trial, the clerk's transcript and supplemental clerk's transcript from McCloud's direct appeal, and the procedural summary portion of our opinion in *McCloud*.[4]  No other evidence was offered by either side.  After argument from counsel, the court took the matter under submission.

On February 2, 2023, the court issued its ruling denying Stringer's petition.  The court found Stringer guilty of two counts of second degree murder under alternative theories:  (1) Stringer was a direct perpetrator in the murders; and (2) Stringer acted with implied malice in aiding and abetting McCloud's acts of shooting into the party.

In finding that Stringer was liable as a direct perpetrator, the court relied on L.L.'s testimony that Stringer told him that he had fired the gun twice before handing it to McCloud.  The court stated that it is "convinced beyond a reasonable doubt as to the credibility of [L.L.]"  The court further explained that L.L.'s testimony was consistent with the testimony of witnesses who described two separate series of gunshots.

Regarding the alternative theory that Stringer is liable as an aider and abettor of McCloud's criminal acts, the court found: (1) McCloud, by shooting into the crowded party, committed the crime of implied malice murder; (2) Stringer intended to aid and

---

[4] We granted Stringer's request to take judicial notice of the reporter's and clerk's transcripts that the court considered in connection with the evidentiary hearing.

abet, and did in fact aid and abet, McCloud's commission of the crime; and (3) In aiding and abetting McCloud, Stringer knew that his conduct endangered the life of another and he acted with conscious disregard for life.

Stringer appealed.

## DISCUSSION

### A. *Sufficiency of the Evidence of Aiding and Abetting Implied Malice Murder*

When, as here, the trial court holds an evidentiary hearing on a section 1172.6 petition, it acts as an independent factfinder to determine whether the defendant is guilty of murder beyond a reasonable doubt under current law. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.) We review the court's factual findings for substantial evidence. (*People v. Underwood* (2024) 99 Cal.App.5th 303, 314.) Under this standard, we " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658; accord, *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

9

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) "[I]mplied malice [thus] requires a defendant's awareness of engaging in conduct that endangers the life of another." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989.) A high degree of probability does not mean, as Stringer suggests, that the act is more probable than not to result in death. Rather, the court or jury needs to find only that "the natural consequences of the act entail[s] a significant risk of death." (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 501; see *People v. Cravens* (2012) 53 Cal.4th 500, 513 (conc. opn. of Liu, J.) [for proof of implied malice, "the probability of death from the act must be more than remote or merely possible"]; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 389 [same].)

Implied malice aider and abettor liability remains a valid theory of murder liability under current law. (*People v. Silva* (2023) 87 Cal.App.5th 632, 639; *People v. Vargas* (2022) 84 Cal.App.5th 943, 953.) "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' "

(*People v. Gentile* (2020) 10 Cal.5th 830, 843.)  Thus, "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life."  (*Id.* at p. 850.)

" 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' "  (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Here, the testimony of Egland—the high school gang intervention specialist—that P.A. said he saw McCloud retrieve a gun from a car and intentionally fire numerous gunshots into the crowded party, and the evidence of P.A.'s corroborating police interview, constitute substantial evidence that McCloud committed a life-endangering act.

The court's finding that Stringer aided and abetted McCloud's firing a gun at the party is also supported by substantial evidence.  According to L.L.—whose testimony the court found credible—Black-T showed Stringer a nine-millimeter firearm and Stringer told McCloud they "can use that" "for protection" at the party.  Stringer and McCloud asked Black-T

11

for the gun, and he agreed to let them have it.  According to L.L., after the shooting, Stringer told him that he attempted to enter the lodge when someone "socked him in the face."  Stringer then ran back to the car and told McCloud, " '[G]et 'em, get 'em, get 'em.' "  Stringer took the gun, fired two shots "[a]t the party," and handed the gun to McCloud, who fired six more shots.

The inference that Stringer and McCloud shot "at the party"—and not in the air as P.A. suggested—is strengthened by the evidence of bullet strikes.  Police investigators found evidence that 10 bullets were fired at the lodge:  three that passed through glass and hit victims; five that hit the lodge near the window; and two that hit a parked car near the lodge.  If, as a detective testified, publicly available magazines for a nine-millimeter gun can hold no more than 10 bullets and all 10 bullets were shot in the direction of the party, then none of the bullets—including the shots Stringer fired—were shot into the air.

There is evidence that Stringer, after being hit in the face and denied entry to the party, told McCloud to "[e]nd the party" and "get 'em, get 'em, get 'em"; Stringer took the gun from McCloud and fired two shots "[a]t the party"; Stringer handed the gun back to McCloud; and McCloud, following Stringer's lead, proceeded to commit the life-endangering act of firing additional shots at the party.  The court reasonably inferred from the combination of these acts that Stringer intended to aid and abet—and did aid and abet—McCloud's life-endangering act, and that he did so with the knowledge that the shooting is dangerous to human life and that McCloud intended to commit the act of shooting, and that Stringer thus acted in conscious disregard for human life.  (See *Reyes*, *supra*, 14 Cal.5th at p. 991.)

12

Stringer suggests that we should give little or no weight to L.L.'s trial testimony because it is arguably inconsistent with his earlier statements and not corroborated by other testimony. As the People point out, however, in reviewing a ruling for substantial evidence, we do not reweigh the evidence or reevaluate a witness's credibility. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118; *People v. Renteria* (2022) 13 Cal.5th 951, 970.) Here, in its ruling on Stringer's petition, the court stated that "[d]espite some inconsistencies, this court believes witness [L.L.'s] testimony at trial was credible." Although he had been threatened by gang members prior to trial and was "scared to testify, [L.L.] testified that he was trying to do the right thing by testifying honestly at trial." The court was "convinced beyond a reasonable doubt as to the credibility of this witness." We thus reject Stringer's suggestion that we reevaluate L.L.'s credibility.

For the foregoing reasons, we conclude substantial evidence supports the trial court finding that Stringer intended to aid and abet, and did aid and abet, McCloud's act of shooting into the crowded party—a life-endangering act—and did so with conscious disregard for human life and with the knowledge that McCloud intended to commit that act. Because the court's finding of liability for implied malice second degree murder is supported by substantial evidence, we do not address Stringer's arguments concerning the court's alternative ground that Stringer was a direct perpetrator of the murders.

## B.    *Consideration of Stringer's Youth*

Stringer contends that he was 19 years old at the time of the shooting—without citation to the record—and the court erroneously failed to consider his youth in determining that he possessed the requisite mental state for implied malice murder.

13

Stringer cites to *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*), which held that a court should consider whether and how a defendant's "youth impacted his ability to form the requisite mental state for second degree murder." (*Id.* at p. 418.)

In *Pittman*, the Court of Appeal discussed the defendant's age and the particular "circumstances of the offense" that "suggest that some of [the] ' "hallmark features of youth" ' may have been at play." (*Pittman, supra*, 96 Cal.App.5th at p. 418.) The court concluded that "remand is appropriate for the court to consider how, if at all, [the defendant's] youth impacted his ability to form the requisite mental state for second degree murder." (*Ibid.*)

Stringer asserts that we should "follow *Pittman* and remand here, as well."

Stringer did not raise this issue below or assert that the court should consider his youth at the time of the shootings. Indeed, it does not appear from our record that anyone brought the defendant's age to the court's attention. He has therefore forfeited the argument on appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881; *People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13.)

In *Pittman*, the defendant had also not raised the issue of his youth in the trial court. The appellate court concluded, however, that he had not forfeited the issue on appeal because the defendant's petition was denied in 2020, and "[t]he relevant appellate cases [deciding that youth is a relevant factor bearing on mental state in section 1172.6 petitions] were not decided until 2021 or later." (*Pittman, supra*, 96 Cal.App.5th at p. 416.) The court listed eight relevant cases decided in 2021 and 2022. (*Ibid.*)

14

*Pittman* is distinguishable because seven of the eight relevant cases cited in *Pittman* were decided before Stringer's December 21, 2022 evidentiary hearing. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 960; *In re Moore* (2021) 68 Cal.App.5th 434, 452–455; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987; *In re Harper* (2022) 76 Cal.App.5th 450, 470; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093; *People v. Keel* (2022) 84 Cal.App.5th 546, 562–563; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.) Thus, unlike the defendant in *Pittman*, Stringer had ample notice of the issue prior to his hearing and the reasons the *Pittman* court gave for finding that the petitioner had not forfeited the issue are absent here.

Even if not forfeited, Stringer makes only an undeveloped perfunctory argument that we "should follow *Pittman* and remand." The *Pittman* court's decision to remand, however, was based upon the circumstances of the defendant's crime. (*Pittman, supra*, 96 Cal.App.5th at p. 418.) Here, by contrast, Stringer fails to refer us to any pertinent facts or provide citations to the record. Because he has failed to establish prejudicial error on this point, we reject the contention. (See *People v. Picazo* (2022) 84 Cal.App.5th 778, 802 [judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error].)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.

16