Filed 3/3/23  P. v. Cyrus CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075271 |
| v. | (Super.Ct.No. FWV18004411) |
| MAURICE CYRUS, JR., | OPINION ON TRANSFER |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bridgid M. McCann, Judge.  Affirmed in part, vacated in part, and remanded with directions.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Maurice Cyrus, Jr., of being a felon in possession of a firearm and found true that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang. (Pen. Code, §§ 29800, subd. (a)(1), 186.22, subd. (b) (§ 186.22(b)); unlabeled statutory references are to this code.) In a bifurcated proceeding, the court found true that Cyrus had a prior serious felony conviction. (§§ 667, subd. (a)(1), 1170.12, subds. (a)-(d).) The court sentenced him to 13 years in state prison, consisting of the upper term of three years for the felon in possession conviction doubled to six years because of the strike, the low term of two years for the gang enhancement, and five years for the prior serious felony.

On appeal, Cyrus argues that the trial court erred by denying his motion to suppress evidence obtained during a search conducted pursuant to a condition of his parole. He also challenges the sufficiency of the evidence supporting the firearm possession conviction and the gang enhancement. In a prior unpublished opinion, we rejected the arguments and affirmed the judgment. (*People v. Cyrus, Jr.* (May 11, 2021, E075271) [nonpub. opn.].)

The Supreme Court granted review, vacated our prior opinion, and transferred the matter back to us with directions to reconsider the matter in light of *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*) and Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) (Stats. 2021, ch. 699), both of which concern the gang enhancement. On remand, Cyrus argues that *Renteria* supports his challenge to the sufficiency of the evidence concerning the gang enhancement under the law in effect at the time of his trial. We agree and conclude that under *Renteria* there is not sufficient evidence to support the

2

gang enhancement. We consequently do not address how Assembly Bill 333 affects this case.

We additionally asked the parties to submit supplemental briefs on the effect of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) on Cyrus's sentence. The parties agree that the legislation applies to this nonfinal judgment but disagree about harmlessness. We vacate Cyrus's sentence and remand for further proceedings in light of Senate Bill 567. We vacate the true findings on the gang enhancement. We otherwise affirm the judgment.

## BACKGROUND

A.      *The Shooting*

The parties stipulated to the following facts: On September 18, 2018, a shooting occurred at a park in the city of Ontario, California. Witnesses identified Marquis B. as the shooter. Before opening fire, Marquis asked others in the park where they were from and announced that he was from the South Side Ontario Crips. Two .40-caliber cartridge casings were collected from the park after the shooting.

B.      *The Gun*

Two months after the shooting, in November 2018, law enforcement officers took Marquis into custody. That night, Officer Edward Flores, a member of the gang suppression unit for the City of Ontario Police Department, and other officers searched an apartment in Ontario, where Cyrus was sleeping in one of the bedrooms on a mattress next to the closet. There also were three children, ages eight to 12, sleeping in the same

3

bedroom. Flores did not believe that anyone else in the apartment was associated with or a member of a gang.

In the closet next to the mattress where Cyrus was sleeping, officers found a bag on a shelf. Inside the bag, officers found a Glock .40-caliber semiautomatic handgun and a large-capacity magazine capable of holding 29 cartridges. The handgun was not registered. On the shelf directly underneath the bag, there was a wallet containing a copy of Cyrus's identification card and Cyrus's health care card dated October 2018.

Test-fired cartridge casings from the handgun were compared to the two shell casings discovered at the park after the September 2018 shooting. A criminalist from the sheriff's department concluded that the shell casings recovered from the park were fired from the handgun found in the closet.

C.    *Gang Evidence*

Officer Kyle Morgan from the gang suppression unit of the City of Ontario Police Department testified as a gang expert familiar with a gang known as the South Side Ontario Crip 9,000 or Crip 9,000, C9,000, or C9. (We refer to the organization as C9 because that is how the witnesses primarily referred to it.) In 2018, C9 was an ongoing organization with at least 30 members that had engaged in a pattern of criminal activity. The primary activities of C9 are selling drugs, possessing firearms, committing assault, and committing burglaries. To identify themselves, members of C9 use different sports team logos, such as the North Carolina Tarheels and the Baltimore Orioles baseball team.

C9 celebrates its "hood day" on September 17. A gang's "hood day" is akin to the gang's birthday and cause for celebration.

A "gang gun" is a gun that is passed around the gang and used by numerous gang members to commit crimes. Morgan explained that a lot of gang members are felons, which makes it difficult for them to get guns. Unregistered guns are useful to gangs because an unregistered gun cannot be traced back to a person using it to commit a crime. In addition to using guns to commit crimes, gang members use firearms to intimidate others. One such intimidation tactic is to post photographs and video recordings of the gang's firearms online to show rival gangs what weapons the gang possesses.

Morgan opined that Cyrus is a member of C9 based on Cyrus's tattoos, Cyrus "talking jail politics on the phone with other C9 gang members," and photographs of Cyrus on social media. Cyrus has various tattoos indicating his membership in C9, including "C9" on his stomach, the hand symbols of the letter C and the number 9 on his biceps, and "West Side" on the top of his shoulders, with the letter C and the number 9 forming into the letter S in one of the words. On the basis of a recorded telephone conversation Cyrus made from jail, Morgan deduced that Cyrus's gang moniker is "Pistol."

In January 2019, when Cyrus was in jail, he made a phone call to Jamal B., a presumed member of C9, and a recording of that conversation was played for the jury. Jamal asked, "what they did, they—they they had got the odie thang?" Cyrus answered the question in the affirmative. Jamal then said that he had told "T-Mac to go grab that. You feel what I'm saying? . . . Cuh, and he—and he left it off to you. I mean that shit wasn't cool. What they had did, a sweep on you or something?" Cyrus answered, "No. This is. They didn't do no sweep. My cousin did some bullshit sent them to the house."

5

Cyrus said that "they got [his] cousin on that other shit" and that he was in jail for "felony possession of a firearm." Morgan testified that he believed that "odie thang" was coded language for the 40-caliber handgun recovered at the apartment.

On the day of the shooting, Flores assisted in the investigation of the shooting at the park. Flores encountered Nicholas A., a C9 member, approximately 50 yards away from the scene of the shooting. Flores downloaded information from Nicholas's cell phone. The download included a photograph of Nicholas taken on September 16, 2018, with a Glock .40-caliber handgun with an extended magazine.

The download also contained a group photograph including Cyrus, which the parties stipulated was taken on September 17, 2018 (C9's hood day and the day before the shooting). In the photograph, Cyrus displayed the hand symbol for the letter C. Also pictured were Jamal, Nicholas, Marquis, Timothy W. (T-Mac), and two other individuals. Jamal was pictured wearing a blue bandana and a shirt with the letter C and "9,000 inside." Nicholas was pictured wearing a blue shirt and appeared to be making a hand gesture of the number 5, which Morgan opined "would be for Five Times Crip gang, which is a Crip gang in San Bernardino." Marquis was wearing a shirt with a bag of money on it.

A music video that had been posted online was played for the jury. Timothy and Jamal were in the video, but Cyrus was not. Some of the common signs and symbols used by C9 were used in the video. Timothy referred to "a 40 with a 30 clip." Morgan opined that the reference was significant because it demonstrated that "a 40 caliber with an extended magazine was going around to Crip 9,000."

6

The parties stipulated that in 2016 Cyrus was convicted of being a felon in possession of a firearm. In 2016, Nicholas was convicted of attempted robbery. And in 2018 another member of C9 was convicted of being a felon in possession of a firearm.

The prosecutor asked Morgan hypothetical questions based on the following facts: A gang celebrates its hood day on September 17, 2018. The next day, member A of this gang goes to a park known to be frequented by rival gang members and asks people in the park where they are from. "Member A then claims his gang, shoots the firearm, and the other party to the shooting is an associate of this rival gang." Someone else drives member A away from the park after the shooting. On November 27, 2018, during the course of investigating the shooting, law enforcement officers go to an apartment where member B, a member of the same gang as member A, is sleeping in an upstairs bedroom. In a closet "next to where member B is sleeping there's a bag. And below that bag is member B's wallet and identification." The bag contains a .40-caliber handgun with an extended magazine. Ballistic testing reveals that the gun was used in the gang shooting in the park by member A. After member B is arrested for possessing the gun, another member of the gang refers to the gun being found and says that "another member was supposed to come pick up that gun."

On the basis of these facts, Morgan opined that the gang benefitted from member B's possession of the firearm. The possession of the firearm benefitted the gang by ensuring that the gun remained "readily available" to the gang in the event of "a gang shooting or something else that goes off." Morgan also opined that possessing the firearm was in association with the gang because it shows that the person who was

keeping the gun was trusted and was "putting in work for that particular gang." In addition, Morgan opined that member B would be assisting member A by ensuring that member A would not be in possession of the firearm if law enforcement arrested member A in connection with the shooting at the park.

DISCUSSION

A.    *Parole Search*

Cyrus argues that the trial court erred by denying his motion to suppress evidence of the gun, because he claims that the warrantless search of the apartment where the gun was found violated his Fourth Amendment right to be free from unreasonable searches. He contends that (1) law enforcement did not have a reasonable belief that he was residing at the apartment, and (2) the search was unreasonable because it was conducted for the purpose of harassing him. We are not persuaded by either contention.

1. *Motion to Suppress*

Before trial, Cyrus moved under section 1538.5 to suppress the evidence of the gun seized from the apartment in Ontario. The People opposed the motion, arguing that the search was valid because Cyrus was on parole when the search was conducted and the apartment's lessee, Brianna B., consented to the search. (The People later abandoned the consent argument.)

At a hearing on the matter, the parties stipulated that the search was conducted without a warrant. The People called Flores to testify. Earlier on the day of the search, Flores learned that Marquis had been taken into custody on suspicion of committing homicide in September 2018. Flores was present when Marquis was interviewed

8

sometime that afternoon. Marquis claimed that on the day of the homicide he was in Ontario at the apartment of his aunt (Brianna) and his uncle (Maurice Cyrus, Sr.) with his cousin, Cyrus. Marquis said that he "'possibly'" had left the apartment with Cyrus that day.

After searching law enforcement records for Cyrus and his father (Cyrus, Sr.), Flores learned that the father was on felony probation and that Cyrus was on parole. Both men had provided parole and probation with the same residence address in Pomona, California. Flores nevertheless believed that Cyrus and his father were actually staying at the apartment in Ontario.

Flores and another officer arrived at the Ontario apartment around midnight. As they approached the apartment, they noticed a vehicle that Flores knew from the prior records search to be registered to Maurice Cyrus. Flores could not recall if the vehicle was registered to Cyrus or his father. Flores knocked on the door of the apartment and identified himself as a police officer. A man whom Flores recognized as Cyrus's father peered through the window blinds. Brianna opened the front door. Brianna confirmed that the man who had looked through the blinds was Cyrus, Sr., and she said that Cyrus was asleep upstairs. Flores initially informed Brianna that law enforcement was there to conduct a probation search of Cyrus, Sr. After Brianna confirmed that Cyrus was there too, Flores told Brianna that the officers also would be conducting a parole search on Cyrus.

The trial court denied the motion to suppress, concluding that the officers reasonably believed that Cyrus lived at the Ontario apartment, given Marquis's

9

statements to law enforcement and the fact that probation and parole records listed Cyrus and his father as living at the same address.

2. *Analysis*

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures' by police officers and other government officials." (*People v. Robles* (2000) 23 Cal.4th 789, 794, quoting U.S. Const., 4th Amend.) "The remedy for a violation of the Fourth Amendment is to render inadmissible any evidence seized during the illegal search." (*People v. Downey* (2011) 198 Cal.App.4th 652, 657 (*Downey*).)

"A search without a warrant is unreasonable under the Fourth Amendment, unless it fits in one of a few narrow exceptions allowing for warrantless searches." (*People v. Vargas* (2020) 9 Cal.5th 793, 814 (*Vargas*).) One such exception is a condition of parole authorizing warrantless searches, such as the condition imposed on California parolees. (*Samson v. California* (2006) 547 U.S. 843, 857 (*Samson*).) A valid parole search, however, is "limited in scope to the terms articulated in the search clause." (*People v. Woods* (1999) 21 Cal.4th 668, 681 [probation].) Section 3067 provides that every California parolee, the parolee's residence, and any property under the parolee's control is "subject to search or seizure by a probation or parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause." (§ 3067, subd. (b)(3); Cal. Code Regs., tit. 15, § 2511, subd. (b).) Whether law enforcement officers reasonably believe an address to be a parolee's residence is a question of fact, "'and we are bound by the finding of the trial court, be it express or

implied, if substantial evidence supports it.'" (*Downey*, *supra*, 198 Cal.App.4th at p. 658 [probationer]; *Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223.) The reasonableness of a search "must be determined based upon the circumstances known to the officer when the search is conducted." (*People v. Sanders* (2003) 31 Cal.4th 318, 334.)

Even if a search is conducted pursuant to a valid condition of parole, a parole search is unreasonable within the meaning of the Fourth Amendment if it is "arbitrary, capricious or harassing." (*People v. Reyes* (1998) 19 Cal.4th 743, 752 (*Reyes*); *Samson*, *supra*, 547 U.S. at p. 846.) Consequently, "'a parole search could become constitutionally "unreasonable" if made too often, or at an unreasonable hour, or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the searching officer.'" (*Reyes*, *supra*, at pp. 753-754.)

"When the trial court rules on a suppression motion, it ""(1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated.""" [Citation.] On appeal, we independently review the second and third determinations, but we apply ""the deferential substantial-evidence standard""" to the court's determination of the historical facts. [Citation.] Even if our reasoning differs from the trial court's, the trial court's ruling must be upheld if there is any basis in the record to sustain it." (*People v. Douglas* (2015) 240 Cal.App.4th 855, 860.)

Substantial evidence supports the trial court's finding that it was reasonable for the officers to believe that Cyrus resided at the Ontario address on the basis of the facts they

11

knew before the search.  Given that Marquis told officers that the apartment belonged to his aunt and uncle (i.e., Cyrus's father), it was reasonable for officers to believe that Cyrus's father lived there even though he had told probation that he lived at an address in Pomona.  It also was reasonable for the officers to believe that Cyrus lived in the Ontario apartment with his father.  Cyrus had given parole the same residence address as his father, so it was reasonable for officers to believe that the two men lived together.  Moreover, Marquis told law enforcement that he had spent time with Cyrus at the apartment two months ago.  In addition, a car registered to Cyrus or his father was parked in front of the apartment, and Cyrus was sleeping at the apartment in the middle of the night.  From this information known to the officers before they conducted the parole search, we conclude that there was substantial evidence supporting the trial court's finding that the officers reasonably believed that Cyrus lived at the apartment in Ontario.

We reject Cyrus's contention that the search was conducted with the "major purpose" of harassing him because it occurred in the middle of the night.  Cyrus did not make that argument in the trial court, so it is forfeited.  (*People v. Tully* (2012) 54 Cal.4th 952, 979-980.)  In any event, there is no evidence that the officers conducted the search to harass Cyrus.  In the afternoon, a homicide suspect told law enforcement that he had been with Cyrus at that apartment, and the officers searched the apartment that night.  There is no evidence that the officers delayed or stalled or otherwise chose to conduct the search late at night as a form of harassment.  Moreover, it was reasonable for the officers to conduct the search as soon as practicable to ensure that any evidence that still existed would not be destroyed or hidden once others discovered that Marquis was in custody.

12

For all of these reasons, we conclude that the trial court did not err by denying Cyrus's motion to suppress evidence.

B.      *Firearm Possession*

The prosecution contended that Cyrus constructively possessed the firearm found in the closet next to the mattress where he was sleeping.  Cyrus argues that the prosecution failed to introduce substantial evidence that he either knew about the gun or had the right to control it.  We are not persuaded.

"In reviewing a sufficiency of the evidence claim, our role is limited.  We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt."  (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*); *Renteria*, *supra*, 13 Cal.5th at p. 970.)  "We draw all reasonable inferences in favor of the judgment."  (*Cardenas*, *supra*, at p. 119, fn. 11.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

Section 29800 prohibits any felon from possessing or having in his or her custody or control any firearm.  (§ 29800, subd. (a).)  "The elements of this offense are conviction of a felony and ownership or knowing possession, custody, or control of a firearm."  (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1029, disapproved on another ground by *People v. Frierson* (2017) 4 Cal.5th 225, 240, fn. 8.; *People v. Bay* (2019) 40 Cal.App.5th 126, 132 (*Bay*).)  "Possession may be actual or constructive."  (*Bay*, *supra*, at p. 132.)

13

"'To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person.'" (*Ibid.*) "Although a defendant may share possession with other people, 'mere proximity' or opportunity to access the contraband, 'standing alone, is not sufficient evidence of possession.'" (*Ibid.*) "With respect to the elements of possession or custody, it has been held that knowledge is an element of the offense." (*People v. Snyder* (1982) 32 Cal.3d 590, 592 [former felon in possession statute].)

The record contains substantial evidence from which a reasonable jury could infer that Cyrus knowingly and constructively possessed the firearm. The gun was in a bag in a closet next to the mattress where Cyrus was sleeping, and the bag was on top of a wallet containing Cyrus's health care card and a copy of his identification. The jury could reasonably infer from the contents of the wallet that the wallet belonged to Cyrus. The jury also could reasonably infer from the placement of the bag on top of the wallet and next to the mattress where Cyrus was sleeping that the bag also belonged to Cyrus and that Cyrus had placed the bag atop the wallet in order to keep his belongings together and close by.

In addition to the proximity of the gun to Cyrus and his wallet, the gun was used two months earlier by another member of C9 in a gang-related shooting. There was further evidence that C9 treated the gun as a gang gun—another gang member had been photographed with a Glock .40-caliber handgun with a large capacity magazine. Moreover, in a recorded jailhouse telephone conversation, another member of the same gang spoke about the gun (albeit in coded language) and indicated that yet another gang

14

member was supposed to pick up the gun from Cyrus before it was found by law enforcement, which Cyrus did not deny or disavow. Cyrus was the only gang member in the apartment when the gun was found. From all of this evidence, the jury could reasonably infer that the gun was a C9 gang gun and that Cyrus, as a C9 member, possessed the gun for the gang when the gun was found.

Cyrus argues that there was insufficient evidence that he knowingly possessed the firearm because there was no evidence about who placed the gun in the closet, when the gun was placed in the closet, what Marquis did with the gun after the shooting, that Marquis and Cyrus communicated after the shooting, that Cyrus knew of the gun before the search, or that all gang members are aware of the location of a gang gun at all times. The absence of that hypothetical evidence is not relevant to our review of the sufficiency of the evidence. We analyze "whether the evidence was sufficient, not whether hypothetical evidence would have strengthened the prosecution's case." (*Vargas*, *supra*, 9 Cal.5th at p. 822.)

Cyrus also suggests various nonincriminating reasonable inferences that could have been drawn from the evidence, such as that he was not currently using the wallet because it did not contain money or his actual identification card, or that Marquis may have placed the bag in the closet without telling Cyrus about it. But in conducting substantial evidence review, we draw all reasonable inferences in support of the judgment, not against it. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119, fn. 11.) We are only concerned with whether "'the circumstances reasonably justify the trier of fact's

15

finding.'"  (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.)  It is therefore irrelevant whether the evidence might also support a contrary finding.

We also reject Cyrus's contention that the present case is factually indistinguishable from *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*), disapproved on another ground by *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.  In *Sifuentes*, a firearm was discovered in the same room as the defendant, who was found to constructively possess it.  (*Id.* at pp. 1413-1414.)  Unlike Cyrus, however, the defendant in *Sifuentes* was one of two gang members in the room where the gun was found, and the gun was found under the mattress near where the other gang member was located.  (*Id.* at p. 1414.)  There also was expert testimony about gang guns in *Sifuentes*.  (*Id.* at p. 1415.)  But in the present case the gun was found among Cyrus's belongings, so the evidence about gang guns was not the only evidence of Cyrus's possession of the gun (cf. *id.* at p. 1417 ["Even assuming the firearm [that the other person in the room] possessed fell into the gang gun category, no evidence showed [that the defendant] had the right to control the weapon"]).

For all of these reasons, we conclude that there was sufficient evidence to support the firearm possession conviction.

C.     *Gang Enhancement—Sufficiency of the Evidence*

Cyrus argues that under *Renteria*, *supra*, 13 Cal.5th 951, the evidence is insufficient to sustain the jury's true finding on the gang enhancement allegation under the law as it existed when he was tried.  We agree.  "'We review the sufficiency of the

16

evidence to support an enhancement using the same standard we apply to a conviction.'"

(*People v. Rivera* (2019) 7 Cal.5th 306, 331.)

Subdivision (b)(1) of section 186.22 (section 186.22(b)(1)), as it existed when Cyrus was tried in 2020, prescribed a sentence enhancement for "'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*Renteria*, *supra*, 13 Cal.5th at p. 962; former § 186.22(b)(1).) Effective January 1, 2022, Assembly Bill 333 amended the gang enhancement statute in several important respects. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478.) Those amendments are not relevant, however, to Cyrus's challenge to the sufficiency of the evidence under the law as it existed when he was tried. (*Renteria*, at p. 961, fn. 6.) Our discussion in this section consequently refers only to that prior version of the statute.

When Cyrus was tried, section 186.22(b)(1) set forth a two-pronged requirement that a felony must "be committed (1) for the benefit of, at the direction of, or in association with [any] criminal street gang, and (2) with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Renteria*, *supra*, 13 Cal.5th at p. 964.) In *Renteria*, our Supreme Court examined the showing needed to satisfy the requirements in "a lone-actor case" (*ibid.*), which the court defined as a case involving "the gang-related conduct of an individual who acts alone" (*id.* at p. 962) and not one concerning "the conduct of individuals acting in concert with other gang members" (*id.* at p. 963). As *Renteria* explained, the distinction is important because "the joint nature of

17

the alleged conduct frequently affects the type of evidentiary showing that is sufficient to demonstrate the conduct was gang-related and committed to promote the criminal activity of gang members, as section 186.22 requires."[1] (*Ibid.*)  In cases in which "multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activity of other gang members, in connection with the very same criminal offense." (*Ibid.*)  The same does not hold true for lone-actor cases.  (*Id.* at p. 964.)

To avoid the constitutional limitation on "the state's power to criminalize membership in particular groups" (*Renteria*, *supra*, 13 Cal.5th at p. 964), *Renteria* emphasized that there must be "'a nexus to gang activity sufficient to alleviate due process concerns'" (*id.* at p. 965).  In describing the means of proving that nexus, *Renteria* discussed two aspects of section 186.22(b)(1)'s intent requirement that are "particularly relevant in lone-actor prosecutions." (*Renteria*, at p. 965.)  The first is that "the specific intent to aid the criminal activities of a gang's members implies knowledge of the nature of at least some of those activities." (*Ibid.*)  *Renteria* explained that this aspect of the intent requirement is important because due process necessitates that "there be a significant connection between the defendant's 'guilty knowledge and intent' and the criminal conduct of the defendant's associates." (*Ibid.*)  "Reading the statute against this backdrop," *Renteria* inferred that in a lone-actor case a defendant "must at least be aware

---

[1]     *Renteria*, like this case, dealt with the gang enhancement statute before it was amended by Assembly Bill 333.  (*Renteria*, *supra*, 13 Cal.5th at p. 961, fn. 6.)

of the type of criminal activity the gang members pursue; without such awareness, the defendant cannot intend to aid in such activity." (*Ibid.*)

*Renteria* noted that the second particularly relevant feature of the intent requirement in lone-actor cases is that former section 186.22(b)(1) "refers to the intent to promote 'criminal conduct by gang *members*,'" which means "the promotion of criminal conduct by more than one member of the gang." (*Renteria*, *supra*, 13 Cal.5th at p. 965.) Because a lone-actor case necessarily involves criminal conduct of an individual acting alone, in a lone-actor case this requirement "necessarily means the promotion of conduct other than the commission of the underlying felony." (*Id.* at pp. 965-966.)

*Renteria* also disapproved of the prosecution's practice of relying "on expert opinion about the potential for a gang member's crime to benefit the gang by, among other things, enhancing a gang's reputation for violence among rival gangs or in the community more generally" to establish the requisite intent in a lone-actor case. (*Renteria*, *supra*, 13 Cal.5th at p. 966.) The court explained: "Without more, evidence that committing a violent crime can enhance the gang's reputation for viciousness in the community does not support an inference that the defendant committed a particular violent crime for the benefit of the gang and with the intent to facilitate known criminal activity by other gang members." (*Id.* at p. 967.) *Renteria* nevertheless approved the use of "expert opinion to connect the defendant's crime with the conduct of the gang and its members" so long as the opinion is ""'"rooted in facts shown by the evidence."'" (*Ibid.*) The court outlined the type of expert opinion that remains permissible. (*Id.* at pp. 967-968.)

Turning to the facts before it, *Renteria* concluded that there was not sufficient evidence to support either element of the gang enhancement statute for the two alleged gang enhancements. (*Renteria*, *supra*, 13 Cal.5th at p. 973.) There, the defendant had shot at two inhabited residences while he was with an unidentified person who was not identified as a gang member. (*Id.* at pp. 958, 970.) The defendant had admitted to being a gang members years earlier and also when he was arrested for the underlying offenses. (*Id.* at pp. 958, 972.) "A 'little while'" before the shooting a neighbor saw the defendant with a group of men walking in a nearby field while yelling the name of the gang to which the defendant admitted belonging. (*Ibid.*)

*Renteria* found that there was no substantial evidence from the circumstances of the crime showing that the defendant "intended his actions to be attributed to his gang." (*Renteria*, *supra*, 13 Cal.5th at p. 971.) In particular, the court noted that "the description of events" did "not support the inference that, by walking along with the group earlier in the night, [the defendant] intended the later shootings to be attributed to the gang." (*Ibid.*) "There was no evidence that [the defendant] identified himself or his gang during the shooting or took credit for it on behalf of his gang afterwards." (*Ibid.*) The court also concluded that there was no substantial evidence that (1) the defendant "could have reasonably anticipated the community would perceive a gang connection," given that there was no evidence that anyone had perceived such a connection, or (2) the defendant "intended the shooting to contribute to his gang's rivalry with" another gang. (*Ibid.*) Finally, as to the expert's testimony that the defendant "may have engaged in the shooting to maintain *his own* respect within the gang," *Renteria* reasoned that "such

20

evidence fails to explain how enhancing his personal reputation within the gang would facilitate the criminal activities of the gang and its members, as section 186.22(b) requires." (*Id.* at p. 972.) *Renteria* therefore concluded that there was no evidence "from which the jury could infer that [the defendant] knew of and thus might have intended to promote the criminal activities of his gang's members." (*Ibid.*)

It is undisputed that this is a lone-actor case. No other gang members were present in the apartment where the gun was found. There was substantial evidence that Cyrus was a member of C9 and that the gun he possessed was used in a gang-related shooting two months earlier and was otherwise used as a gang gun, as described *ante*. The People argue that this evidence "clearly showed [that Cyrus] possessed the weapon with the *specific intent* to promote, further, or assist criminal conduct by gang members." (Italics added.) We do not agree, because the argument is foreclosed by *Renteria*. A reasonable jury could not infer from Cyrus's gang membership and the gun's status as a gang gun that Cyrus was aware "of the type of criminal activity [C9] gang members pursue" (*Renteria*, *supra*, 13 Cal.5th at p. 965) or "that [Cyrus] knew of and thus might have intended to promote the criminal activities of his gang's members" (*id.* at p. 972). The evidence shows that Cyrus was a gang member who committed the crime of possessing a firearm that had been used in a prior gang-related shooting and was otherwise important to the gang. Nothing in that evidence supports an inference that Cyrus had any awareness "of the type of criminal activity [C9] gang members pursue," as he must to satisfy the specific intent requirement of section 186.22(b)(1) under *Renteria*. (*Renteria*, at p. 965.)

21

The People contend that there was evidence that Cyrus knew of the previous shooting—and thus possessed the requisite knowledge of the criminal activities of C9 members—because in the jailhouse conversation he pointed out that police had come to his residence and conducted a search because Marquis had sent them there. In the recorded jailhouse conversation, Cyrus said that he was in jail for "felony possession of a firearm" because his cousin, whom "they got . . . on that other shit," had said something to send law enforcement to his residence. That evidence does not support the inference Cyrus knew that Marquis "had used the gun in the shooting and then directed the police to the apartment where the gun was hidden," as the People suggest. Instead, the evidence supports the inference that Cyrus knew that law enforcement searched his residence as a result of something Marquis had told them. It does not support any inference that Cyrus was aware of the previous shooting or that it was gang related. And there was no other evidence from which the jury could infer that Cyrus had an awareness of the criminal activities of C9 members.

Given that there was no evidence that Cyrus was "at least" aware of the type of criminal activities pursued by C9 members, he cannot have intended "to aid in such activity" by possessing the firearm. (*Renteria*, *supra*, 13 Cal.5th at p. 965.) We therefore conclude that there was not sufficient evidence that Cyrus possessed the requisite specific intent to aid the criminal activities of C9's members and that the evidence was therefore insufficient to support the gang enhancement under the law as it existed when Cyrus was tried. We accordingly vacate the true finding on the gang enhancement allegation.

22

D. *Senate Bill 567*

Being a felon in possession of a firearm is punishable by 16 months, two years, or three years in state prison.  (§§ 18, 29800, subd. (a)(1).)  The trial court sentenced Cyrus to the upper term of three years for the felon in possession conviction, doubled to six years because of the prior strike conviction.  (§ 1170.12, subd. (c)(1).)

Effective January 1, 2022, Senate Bill 567 amended section 1170 to impose limits on a trial judge's discretion in choosing between the low, middle, and upper terms of a sentencing triad.[2]  (Stats. 2021, ch. 731.)  Before the amendments, if a statute prescribed a sentencing triad, the court had discretion to choose any one of the three terms.  (Stats. 2021, ch. 731; former § 1170, subd. (b).)  When presented with such a choice now, the court must impose the low term if the defendant's youth or another specified mitigating circumstance was "a contributing factor in the commission of the offense," "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice" (§ 1170, subd.

---

[2]     On October 8, 2021, the Governor signed into law three bills that amended section 1170:  Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 719, § 2), and Senate Bill 567 (Stats. 2021, ch. 731, § 1.3).  Senate Bill 567 has the highest chapter number, so we presume that it was the last enacted of the bills.  (Gov. Code, § 9510; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1074, fn. 2 (*Gerson*).)  Senate Bill 567 incorporates the changes made to section 1170 by the other bills if all three bills were enacted and became effective on or before January 1, 2022, and Senate Bill 567 was the last enacted bill.  (Stats. 2021, ch. 731, §3(c).)  The conditions were satisfied.  Because Senate Bill 567 was enacted after the other two statutes, Senate Bill 567 became the operative legislation.  (Stats. 2021, ch. 731, §§ 1.3, 3(c); Gov. Code, § 9605, subdivision (b).)  We therefore refer to all of the changes made to section 1170 as deriving from Senate Bill 567.

(b)(6)(A)-(C)).  A defendant is considered a youth for purposes of this provision if the defendant was "under 26 years of age on the date the offense was committed." (§§ 1016.7, subd. (b), 1170, subd. (b)(6)(B).)

In addition, section 1170 now provides that the upper term shall not be imposed unless the facts underlying the aggravating circumstances that would justify imposing the upper term are (1) stipulated to by the defendant, (2) found true by the trier of fact beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction.  (§ 1170, subd. (b)(2)-(3).)  The People concede that Senate Bill 567 applies retroactively to this appeal under *In re Estrada* (1965) 63 Cal.2d 740, and we agree.  (See, e.g., *People v. Ross* (2022) 86 Cal.App.5th 1346, 1352.)  Cyrus and the People do not agree about whether remand for resentencing is required.

Cyrus was 22 years old when the offense was committed.  In sentencing Cyrus to an aggregate sentence of 13 years, the trial court recognized Cyrus's "youthfulness."  The court had read and considered the report of the probation officer, who recommended a 14-year sentence.  The probation officer found there to be no mitigating circumstances affecting Cyrus's sentence (former Cal. Rules of Court, rule 4.423) but found the following aggravating circumstances present:  (1) Cyrus used a weapon in committing the offense, (2) Cyrus's prior convictions were "numerous and of increasing seriousness," (3) Cyrus had served two prior prison terms, (4) Cyrus was on parole when the offense was committed, and (5) Cyrus's conduct on parole and probation had been unsatisfactory. (Former Cal. Rules of Court, rule 4.421.)  The court expressed concern that Cyrus had already been incarcerated and had not demonstrated any change in behavior as a result.

24

The court did not believe that Cyrus's crimes demonstrated any escalation but noted that he was "on parole or probation every time something happen[ed]."

Although the court considered Cyrus's "youthfulness" when it sentenced him, it did not otherwise explain how that consideration affected its sentencing decision. The court was not constrained by Senate Bill 567's amendments to section 1170 at sentencing, because they did not yet exist. Thus, the court was not bound by the now-governing presumption favoring imposition of the low term if Cyrus's age contributed to the commission of the offense (§ 1170, subd. (b)(6)(B)), and the court consequently did not determine whether his age did contribute.

"When being sentenced, a defendant is entitled to decisions made by a court exercising informed discretion." (*People v. Tirado* (2022) 12 Cal.5th 688, 694.) "'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) When postsentencing statutory amendments would affect a trial court's sentencing discretion, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*Ibid.*; *People v. Flores* (2020) 9 Cal.5th 371, 431.)

We cannot say on this record whether the trial court would conclude that Cyrus's age contributed to his commission of the offense so as to trigger the low term presumption in subdivision (b)(6) of section 1170. When Cyrus was sentenced, the trial

court had no statutory reason to make, and Cyrus had no reason to seek, a finding that his age was a contributing factor to his commission of the offense. (*Gerson*, *supra*, 80 Cal.App.5th at p. 1096.) Moreover, at that time a defendant's youth was not listed in the court rules as a mitigating circumstance the court should consider in sentencing. (Former Cal. Rules of Court, rule 4.423(b).) The probation department consequently did not list Cyrus's age as a mitigating circumstance. Moreover, if the trial court did conclude that Cyrus's age contributed to the commission of the offense, we cannot say with confidence on this record whether the trial court would then conclude that "imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Because the record does not clearly indicate that the trial court would have imposed the same sentence, we vacate Cyrus's sentence on count 1.

Because we are vacating Cyrus's sentence on count 1, Cyrus is entitled to a full resentencing. (*Gerson*, *supra*, 80 Cal.App.5th at p. 1096 [vacating sentence and remanding for consideration of the new low-term presumption in § 1170, subd. (b)(6)]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [same].) Under the full resentencing rule, "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425.) The sentence imposed on resentencing may not exceed the original aggregate sentence. (*People v. Jones* (1994) 24 Cal.App.4th 1780, 1783-1784; *People v. Hanson* (2000) 23 Cal.4th 355, 357-358.)

E.    *Due Process*

Cyrus argues that his federal due process rights were violated because the firearm possession conviction and the true finding on the gang enhancement were not supported by substantial evidence.  Because we conclude that the firearm possession conviction was supported by substantial evidence and vacate the true finding on the gang enhancement, this argument fails.

## DISPOSITION

We vacate Cyrus's sentence on the firearm possession conviction and remand for proceedings consistent with this opinion.  We vacate the true finding on the gang enhancement because it is not supported by substantial evidence.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MENETREZ_____
                                                                                    J.


We concur:

RAMIREZ_____
                        P. J.
McKINSTER_____
                        J.

27