Filed 5/31/23  P. v. Tuvalu CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060774 |
| v. | (Super. Ct. No. C-56992) |
| TUTUILA FAUSIA TUVALU, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Kimberly Menninger, Judge.  Reversed and remanded.

Jill Kent, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Tutuila Fausia Tuvalu appeals from a postjudgment order denying his petition for resentencing under former Penal Code section 1170.95 (now § 1172.6),[1] wherein he sought resentencing for his 1985 first degree murder conviction. After an evidentiary hearing, the trial court concluded Tuvalu was not entitled to resentencing because he was a major participant in the underlying felony and acted with reckless indifference to human life.

Tuvalu contends the trial court's major participant and reckless indifference findings are not supported by substantial evidence and the order denying his petition should be reversed. After briefing was complete, we invited the parties to submit supplemental briefs addressing whether emergent case law requires us to vacate the order denying Tuvalu's resentencing petition and remand the matter to the trial court for it to consider Tuvalu's youth as a part of the totality of the circumstances in determining whether he was a major participant who acted with reckless indifference to human life. In response, Tuvalu argued his case should be "remanded for the trial court to have a meaningful opportunity to consider [his] youth at the time of the offense as part of the totality of the circumstances . . . ." The Attorney General asserted remand was unnecessary because Tuvalu argued in the trial court his age was a factor showing he did not act with reckless indifference and the trial court implicitly rejected this argument in its findings.

We find the "unusual circumstances" in this case are similar to those in *People v. Jones* (2022) 86 Cal.App.5th 1076, 1079 (*Jones*). Here, as in *Jones*, the evidentiary hearing occurred before recent caselaw made clear a defendant's youth is "'*a relevant factor*' [to be considered] in deciding whether a defendant was a major participant who acted with reckless indifference to human life" (*id.* at p. 1079) and the

[1] Former section 1170.95 was renumbered section 1172.6 without substantive change in the text, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) All subsequent statutory references are to the Penal Code unless otherwise stated.

record does not show the trial court considered Tuvalu's age and maturity level, "particularly to the extent now required by cases issued after [Tuvalu]'s hearing. [Citation.]" (*Id.* at p. 1092.) Accordingly, we vacate the order denying Tuvalu's petition for resentencing and remand the matter to the trial court for further consideration.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.

### THE FACTS UNDERLYING TUVALU'S MURDER CONVICTION

In January 1985, Richard Duran was staying with Steve Fritchel in Fritchel's apartment. Duran had been in a relationship with codefendant Lisa Mondragon, and she visited him at the apartment twice. On both occasions, Fritchel, who sold marijuana and cocaine to his friends, had drugs laying around the apartment. At the end of January, Duran moved out of the apartment and Mark Meeker moved in at the beginning of February 1985.

In the early evening hours of February 6, 1985, Duran saw Tuvalu riding in a car driven by codefendant Clement Brown. Tuvalu was holding a shotgun.

Around that time, Brown and Tuvalu went to Mondragon's house. Mondragon wanted to go to Fritchel's apartment to buy cocaine because Mondragon, her cousin, and her friend planned to "party" at a motel that night. Mondragon invited Brown to party with them, and Brown offered to give her a ride to get the cocaine. During the drive to Fritchel's apartment, Brown and Tuvalu had a brief conversation in Samoan; Mondragon did not understand what they were saying.

---

[2] We granted Tuvalu's unopposed motion for judicial notice of the clerk's and reporter's transcripts from his 1985 trial proceedings. (Evid. Code, §§ 459, subd. (a), 452, subd. (d).)

Around 8:00 p.m., Fritchel and Meeker were joined at their apartment by Brian Allen and neighbors Mark Kalagian and William Cody[3] to watch a movie. Meeker, Allen, and Kalagian were sitting on the living room couch waiting for the movie to start. Fritchel and Cody were talking near Fritchel's bedroom when there was a knock on the apartment door. Meeker and Kalagian said, "Come in" or something similar. Fritchel walked to the living room to see who it was.

Mondragon entered the apartment, followed by Tuvalu and Brown. Tuvalu was wearing a trench coat and pulled out a sawed-off shotgun from underneath his coat.[4] Brown was carrying an item described as a "stick," "baton," or "club."

Tuvalu ordered everyone to get on the floor and not move, threatening they would be shot if they did. He grabbed Allen by the hair and dragged him across the coffee table onto the floor. Fritchel, Meeker, and Kalagian laid face down on the floor and put their hands out as instructed. Tuvalu closed the apartment's drapes.

Brown and Tuvalu demanded to know, "'Where's the shit?'" Fritchel responded they had nothing. Fritchel got up and walked to his bedroom with Brown. Brown ransacked Fritchel's bedroom, asking where is "the shit." Brown found a quarter gram of cocaine on the table in Fritchel's bedroom and took it.

While Kalagian was on the floor, Tuvalu came over and put the shotgun to the back of his head. He told Kalagian if he moved his head, he (Tuvalu) would blow it

---

[3] During the trial, the victim was referred to as William Cody and William Gowan. For consistency, we will use Cody throughout this opinion.

[4] There was conflicting evidence as to whether Tuvalu or Brown had the shotgun. Meeker and Fritchel identified Tuvalu as the man with the shotgun. Fritchel was "positive" Tuvalu was carrying the shotgun and Brown was carrying a club. However, Kalagian testified Brown resembled the man with the shotgun.

After reviewing the trial transcripts at the evidentiary hearing on Tuvalu's resentencing petition, the trial court found Tuvalu had the shotgun. We review the evidence in the light most favorable to the judgment. (*People v. Renteria* (2022) 13 Cal.5th 951, 970.) We do not reweigh the evidence or reevaluate the credibility of the witnesses. (*Ibid.*)

off; so Kalagian did not move. Tuvalu demanded Kalagian's wallet. When Kalagian said he did not have one, the shotgun was poked harder into the back of his head and he was frisked. Kalagian recalled the men asking, "'Where's the money?'"

Meeker and Allen were patted down and had their wallets taken. Allen felt the gun in his back several times. Tuvalu kicked Allen and held Allen down with his foot.

Brown and Fritchel returned from the bedroom and Fritchel resumed his position face down on the hallway floor. Brown hit Fritchel in the back with the club and again demanded to know where the stuff was. Fritchel responded he had money in his pocket. Brown retrieved $750 from Fritchel's pants pocket. Brown walked over to Tuvalu, talked to him, and returned to Fritchel's room.

While on the floor, Fritchel saw Tuvalu pointing the gun at the back of Kalagian's head. Fritchel made a loud noise to distract Tuvalu. When Tuvalu turned, Fritchel grabbed him and the shotgun. A struggle ensued as the two men wrestled for control of the shotgun. Meeker saw "a body fly[] across the room" and he ran out the apartment door.

When the fighting started, Allen crawled toward the apartment door. Mondragon grabbed him and said, "'Stay put, these guys mean serious shit.'" When Allen expressed he was "'afraid to die,'" Mondragon told him to "'stay down'" and forcibly held him down. Allen pushed Mondragon off of him and ran out of the apartment.

Tuvalu ended up on the floor face down with the shotgun in his hands; Fritchel was on his back. Fritchel tried but was unable to pry the shotgun from Tuvalu. Kalagian got up and joined Fritchel in his struggle with Tuvalu, trying to pry the shotgun from Tuvalu's hands.

While the three men battled for control of the shotgun, Cody was fighting Brown. Fritchel saw Brown hit Cody with the club. At one point, Cody gained the upper

hand and was hitting Brown.  Mondragon came up behind Cody and punched him in the side of the head with clenched fists.

Fritchel told Kalagian to hold down Tuvalu while he (Fritchel) went to help Cody with Brown.  As Fritchel went toward Brown, Brown grabbed a knife off of the kitchen counter and cut Fritchel's left arm.

Kalagian continued to wrestle Tuvalu, who was curled up in a ball and facing the wall with the shotgun in his hands.  Kalagian was on top of Tuvalu, holding him down, and Kalagian had a hand on the shotgun.  Tuvalu tried to get Kalagian off of him and regain full control of the shotgun.  Kalagian was tiring and losing his grip on the shotgun.  He yelled out to Cody and Fritchel for help.  In the melee, Kalagian saw Cody being struck over the head with a picture frame taken off the wall.

While Fritchel was engaged with Brown, Cody ran over to help Kalagian with Tuvalu.  Brown ran after Cody.  When Cody tried to push Brown away, Brown stabbed him in the chest three times.  Cody looked at Fritchel, said "'help,'" and fell to the floor, bleeding.

Fritchel went to help Cody.  He grabbed a pan off the table and struck Brown with it twice, causing him to drop the knife.  Fritchel seized Brown, picked up the knife, and held it to Brown's ribs.

Kalagian heard Tuvalu yell, "'Help us, help us'" and "'Do something.'"  Mondragon hit Kalagian in the side of the head with a kitchen pan.  Fearing for his life, Kalagian pushed Mondragon aside and ran for the door.  As he was fleeing, he heard Brown tell Tuvalu, "'Don't let him get away.  Shoot him.'"  Kalagian fled to a nearby apartment where he asked them to call the police.

Back in Fritchel's apartment, Fritchel was holding the knife against Brown.  Tuvalu hit Fritchel in the back of the head with the butt of the shotgun.  Fritchel and Brown "went flying," and Fritchel ended up on the floor on top of Brown.  Tuvalu pointed the shotgun at Fritchel's face.  Fritchel threw the knife at Tuvalu.  Brown yelled

6

at Tuvalu to shoot and kill Fritchel and then ran out of the apartment. Fritchel kicked at Tuvalu and the shotgun. Tuvalu turned the shotgun around and hit Fritchel with the butt of the gun before running out of the apartment. Fritchel chased after them but passed out on the lawn.

When Meeker returned, he found Fritchel on the ground with injuries to his arm and head. Cody was on the kitchen floor and appeared to be dead. A broken picture frame and glass were near his body. Cody died from a stab wound where the knife penetrated his left lung and his heart. Cody also had crushing lacerations on the back of his head, multiple, sharp lacerations around his eyes, and a tip of a knife in his skull.

Police responded and investigated the crime scene. They found a shotgun shell under the living room couch and a wallet on the living room floor. The shotgun's forestock was found in the hallway near the wall; other parts of the shotgun were found near the hallway and in the kitchen. A knife with a broken tip was found near the kitchen.

Brown, Tuvalu, and Mondragon returned to Mondragon's house about an hour after they left. After picking up Mondragon's cousin and friend, they went to a motel.

Police subsequently executed search warrants at the homes of Tuvalu and Brown. A shotgun was found in Brown's bedroom, and shotgun shells were found in Tuvalu's residence and Brown's car.

II.

PROSECUTION OF TUVALU, BROWN, AND MONDRAGON

The district attorney charged Tuvalu, Brown, and Mondragon with murder (§ 187), robbery (§ 211), and burglary (§ 459). The information alleged Brown personally used a knife in the commission of the murder (§ 12022, subd. (b)).

All three defendants were tried before a single jury, which was instructed on felony murder. The jury convicted Tuvalu and Brown of all counts and found true the

7

personal use allegation as to Brown.  The jury was unable to reach a verdict as to the charges against Mondragon, and the court declared a mistrial as to her.  In November 1985, the court sentenced Tuvalu to an indeterminate term of 25 years to life.

## III.

### TUVALU'S PETITION FOR RESENTENCING

In May 2019, Tuvalu filed a petition for resentencing under former section 1170.95.  The court found Tuvalu had made a prima facie case of entitlement to relief and issued an order to show cause.

At the evidentiary hearing, the parties relied on the transcripts from Tuvalu's original trial and did not present new or additional evidence.  The parties' briefs and oral arguments identified the disputed and dispositive issue as whether the evidence showed beyond a reasonable doubt that Tuvalu was a major participant in the robbery or burglary and acted with a reckless indifference to human life as defined by section 190.2.  After hearing the parties' arguments, the court took the matter under submission.

The court later issued a detailed written ruling.  It denied Tuvalu's resentencing petition based on its findings Tuvalu was a major participant in the underlying robbery as he "abetted, aided, counseled, requested and assisted in the commission of the robbery that resulted in the death of William Cody" and Tuvalu acted with reckless indifference to Cody's life.

Tuvalu timely appealed the court's order.

## DISCUSSION

Tuvalu contends the trial court's order denying his resentencing petition should be reversed because the court's findings he was a major participant in the underlying robbery and acted with reckless indifference to human life are not supported by substantial evidence.  He asserts we should employ an independent standard of review rather than evaluate for substantial evidence because the trial court's decision was based

8

on the documentary record of his original trial and no live witness testimony was presented at the evidentiary hearing on his petition. Citing *People v. Vivar* (2021) 11 Cal.5th 510, he contends his case is "a 'cold record' case" and therefore the trial court's findings are not entitled to deference. We disagree.

Instead, we agree with the several Courts of Appeal that have applied the substantial evidence standard and have rejected the argument a trial court's ruling on a section 1172.6 petition, when based on the review of a cold record, is subject to independent review on appeal. (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109-1110; *People v. Oliver* (2023) 90 Cal.App.5th 466, 479-480 (*Oliver*); *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591; *People v. Clements* (2022) 75 Cal.App.5th 276, 298, 302.)

However, before reaching the substantial evidence review, we must examine the relevant legal principles that were before the trial court at the time of the evidentiary hearing and the development of one since. This examination reveals the trial court was likely unaware of the need to consider Tuvalu's youth and maturity level in determining whether he was a major participant in the robbery as elucidated in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and acted with reckless indifference to human life as discussed in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). At the time of Tuvalu's evidentiary hearing, case law was not fully developed on the relevance of a defendant's youth in conducting the major participant and reckless indifference analysis. This has since changed. Because the record does not show the court considered this factor in its determination, we reverse the order denying Tuvalu's resentencing petition and remand the matter for the trial court to have an opportunity to consider Tuvalu's youth as part of its analysis.

9

## I.

### APPLICABLE LEGAL PRINCIPLES

A.  Section 1172.6

In 2018, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which made significant changes to accomplice liability for murder.  (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*).)  With Senate Bill 1437, the Legislature amended the felony murder rule and eliminated the natural and probable consequences doctrine for murder "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

"As relevant here, Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent . . . ." (*Strong, supra*, 13 Cal.5th at pp. 707-708.)  It did this by amending section 189.  (Stats. 2018, ch. 1015, § 3; *Strong, supra*, 13 Cal.5th at p. 708.)[5]  As amended, section 189 "now limits liability under a felony-murder theory principally to 'actual killer[s]' [citation] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' [citation].  Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . Section 190.2'—that is, the statute defining the felony-murder special circumstance.  [Citation.]"  (*Strong*, at p. 708.)  Here, Tuvalu was neither the actual killer nor found to have an intent to kill.  Thus, under the amended statute, he is

---

[5]  Senate Bill 1437 also amended section 188 to eliminate the natural and probable consequences doctrine as a basis for finding a defendant guilty of second degree murder. (Stats. 2018, ch. 1015, § 2; see *People v. Gentile* (2020) 10 Cal.5th 830, 842-843).  We need not discuss those changes further as the natural and probable consequences doctrine liability theory for murder was not at issue in this case.

10

liable for murder only if he was a major participant in the robbery and acted with a reckless indifference to human life as described in section 190.2.

B.  Major Participant and Reckless Indifference Factors

"In 2015 and 2016, our high court 'substantially clarified the law governing findings under . . . section 190.2, subdivision (d)' in *Banks, supra*, 61 Cal.4th 788 and *Clark, supra*, 63 Cal.4th 522.  [Citation.]  '*Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry.'  [Citation.]" (*Oliver, supra*, 90 Cal.App.5th at p. 478.)

In *Banks*, the Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks, supra*, 61 Cal.4th at p. 794.)  It identified a series of factors to help guide this inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)  The Supreme Court explained:  "No one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major'[.]  [citations.]" (*Ibid.*)

The following year, in *Clark*, the Supreme Court focused on the element of reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at pp. 614-623.)  It

11

concluded "'reckless indifference,' . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The Supreme Court explained reckless indifference has "both subjective and objective elements." (*Ibid.*) Discussing these elements, the Supreme Court later explained: "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. [Citations.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) Nor can reckless indifference to human life be established by "knowing participation in an armed robbery, standing alone." (*Strong, supra*, 13 Cal.5th at p. 706.)

In *Clark*, the Supreme Court analyzed a series of factors relevant to the determination of whether the defendant acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at pp. 618-622.) These factors are: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the

12

defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.]" (*Scoggins, supra*, 9 Cal.5th at p. 677.) The *Clark* court indicated, like the factors identified in connection with the major participant inquiry in *Banks*, no single factor is necessary nor "'necessarily sufficient.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 618.)

The Supreme Court also stated the major participant element is interrelated to the reckless indifference element (*Clark, supra*, 63 Cal.4th at p. 614), explaining "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' [Citation.]" (*Id.* at p. 615.) Indeed, the factors guiding the analysis of each element "'significantly overlap.'" (*Ibid.*)

In *Scoggins, supra*, 9 Cal.5th 667, the Supreme Court further clarified some of the *Clark* factors. (See *In re Moore* (2021) 68 Cal.App.5th 434, 449-450 (*Moore*) [discussing *Scoggins*'s analysis of factors].) One principle to be taken from these Supreme Court cases is that the factors the court has provided as relevant to the major participant and reckless inference analyses are not exclusive. The Supreme Court has emphasized the determination of whether a defendant was a major participant who acted with reckless indifference to human life is "a fact-intensive, individualized inquiry. [Citation.]" (*Scoggins, supra*, 9 Cal.5th at p. 683.)

C. Youth as a Factor

Recently, several California Courts of Appeal have concluded a defendant's youth is a relevant factor to consider in analyzing whether a defendant was a major participant who acted with reckless indifference to human life. The first case to touch on the issue was *People v. Harris* (2021) 60 Cal.App.5th 939 (*Harris*).[6] In *Harris*, the trial

---

[6] Review was granted in *Harris, supra*, 60 Cal.App.5th 939 on April 28, 2021, S267802, and dismissed on September 28, 2022.

13

court denied the defendant's resentencing petition (§ 1172.6) without issuing an order to show cause, after concluding the defendant was ineligible for relief as a matter of law based on a pre-*Banks* and pre-*Clark* felony-murder special circumstance finding. (*Harris*, at pp. 949-950.) The Court of Appeal held the trial court erred by relying on the pre-*Banks* and pre-*Clark* special circumstance finding to conclude the defendant was ineligible for relief. The *Harris* court explained the determination of whether the defendant was eligible for relief required a review of the record of conviction in light of the *Banks* and *Clark* factors. (*Harris*, at p. 958.) The Court of Appeal reversed the order denying the resentencing petition and remanded the matter with directions to issue an order to show cause. (*Id.* at p. 961.) Expounding upon why an evidentiary hearing was necessary to determine whether the defendant was a major participant in the underlying felony, the *Harris* court commented: "[G]iven Harris's youth at the time of the crime [17 years old], particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that Harris was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants.' [Citation.]" (*Id.* at p. 960.)

*Moore, supra*, 68 Cal.App.5th 434 was the next case to address the issue. In *Moore*, the petitioner, who was 16 years old at the time of his offense, filed a petition for writ of habeas corpus challenging the sufficiency of the evidence of a pre-*Banks* and pre-*Clark* robbery-murder-special-circumstance finding. (*Moore*, at p. 439.) After the Court of Appeal summarily denied the writ petition, the Supreme Court ordered the Court of Appeal to determine whether Moore was entitled to habeas relief and "to consider 'whether [Moore's] youth at the time of the offense should be one of the factors considered under' *Banks* and *Clark*." (*Ibid.*) The Court of Appeal held "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life. Indeed, the 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences'—are arguably

14

more germane to a juvenile's mental state than to his or her conduct. [Citation.]" (*Id.* at p. 454.)

In *Moore*, the Court of Appeal considered the totality of the circumstances, including the petitioner's youth at the time of the offense, and concluded the evidence was insufficient to establish he acted with reckless indifference to life. (*Moore, supra*, 68 Cal.App.5th at p. 439.) Explaining its conclusion, the Court of Appeal stated: "'"[T]he background and mental and emotional development of a youthful defendant [must] be duly considered" in assessing his culpability.' [Citation.]" (*Id.* at p. 453.) "To the extent the *Clark* factors discussed *ante* support a finding of reckless indifference for an adult . . . those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth." (*Id.* at p. 454.) Unable to conclude "Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery" (*id.* at p. 454, fn. omitted), the Court of Appeal vacated the robbery-murder special circumstance finding (*id.* at p. 455).

In *People v. Keel* (2022) 84 Cal.App.5th 546 (*Keel*), the Court of Appeal agreed "youth can be a relevant consideration—potentially an important one, depending on the facts of the case—bearing on whether a juvenile defendant acted with reckless indifference to human life. [Citations.]" (*Id.* at pp. 558-559.) In support, it cited *In re Harper* (2022) 76 Cal.App.5th 450 (*Harper*). In *Harper*, the Court of Appeal assumed, without deciding, youth was an appropriate factor to consider in the analyses under *Banks* and *Clark* (*Harper*, at p. 466), commenting "youth would appear to be an obvious consideration when determining whether a defendant acted with reckless indifference to human life . . ." (*id.* at p. 466, fn. 8). *Keel* also cited to *People v. Ramirez* (2021) 71 Cal.App.5th 970 (*Ramirez*) in support. (*Keel*, at p. 559.) In *Ramirez*, the Court of Appeal reversed an order denying a resentencing petition after finding the petitioner's youth at the time of the murder significant and that it "greatly diminishe[d] any inference

he acted with reckless disregard for human life by participating in the attempted carjacking knowing [his cohort] was armed." (*Id.* at p. 990.)

In *Jones, supra*, 86 Cal.App.5th 1076, the Court of Appeal held a defendant's youth must also be considered with the *Banks* and *Clark* factors. (*Jones*, at p. 1088, fn. 7.) The defendant in *Jones* sought resentencing under former section 1170.95 for his felony murder conviction. (*Jones*, at p. 1079.) At the resentencing hearing, his counsel asked the court to consider his youth at the time of the offense, arguing he was only 20 years old, "'immature' and 'still developing.'" (*Id.* at p. 1091.) A report concerning the defendant's background and characteristics was included in the record of conviction. (*Ibid.*) After an evidentiary hearing, the court denied the petition. In a detailed ruling, the court explained its findings the defendant was a major participant who acted with reckless indifference to human life. (*Id.* at pp. 1079, 1082.) However, the court did not mention the defendant's age or maturity level in its decision. (*Id.* at p. 1091.)

On appeal, the defendant in *Jones* argued the court's findings he was a major participant and acted with reckless indifference were not supported by substantial evidence. (*Jones, supra*, 86 Cal.App.5th at p. 1087.) The Court of Appeal concluded it could not determine whether substantial evidence supported the trial court's findings "based on the *totality* of the circumstances" because that totality "necessarily includes the defendant's youthful age, which the record [did] not indicate the court considered." (*Id.* at p. 1091.) The *Jones* court rejected the Attorney General's argument it was required to presume in the case "the trial court followed the law in exercising its duties and duly considered the evidence presented to it. [Citations.]" (*Id.* at p. 1092.) The Court of Appeal acknowledged that "[i]n the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Ibid.*) But the Court of Appeal found the circumstances of the case were "unusual" because the trial court's ruling occurred prior to the decision in *Moore*. (*Jones*, at p. 1079.) It

16

concluded, therefore, it was unlikely "the trial court could have known to consider [the defendant's] age and maturity level, particularly to the extent now required by cases issued after [his] hearing. [Citation.]" (*Id.* at p. 1092.) Rather than evaluate the evidence concerning the defendant's youth in the first instance, the *Jones* court reversed the order denying the resentencing petition and remanded the matter for "the trial court to have a meaningful opportunity to consider [the defendant's] youth as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life." (*Id.* at p. 1093.)

Similarly, in *Oliver, supra*, 90 Cal.App.5th 466, the defendant's resentencing petition was denied prior to the decision in "*Moore*—the first case expressly holding that a defendant's youth is a relevant factor in a *Banks*/*Clark* analysis . . . ." (*Id.* at p. 488.) As in *Jones*, the Court of Appeal (First District, Division One) found it unlikely the trial court knew to consider the defendant's age and maturity level when analyzing whether he was a major participant who acted with reckless indifference to human life. (*Ibid.*) However, the *Oliver* court concluded "even if the trial court was required to expressly consider Oliver's youth, any such error in this regard is harmless under the specific circumstances of this case" under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Oliver*, at p. 489 & fn. 8.)

## II.
### THE MATTER MUST BE REMANDED FOR THE TRIAL COURT TO CONSIDER TUVALU'S AGE AND MATURITY LEVEL IN THE *BANKS* AND *CLARK* ANALYSIS

In the trial court, Tuvalu's counsel asserted in his resentencing petition brief "it seems appropriate" the court should consider Tuvalu's youth at the time of the murder in evaluating Tuvalu's knowledge of Brown's likelihood of killing—*one* of the factors in the reckless indifference analysis. At the evidentiary hearing on Tuvalu's resentencing petition, his counsel referenced "the *Harris* case" and briefly argued *Harris*

17

requires consideration of a defendant's young age in the subjective component of the reckless indifference element.

The trial court denied Tuvalu's petition in a detailed ruling, concluding Tuvalu was a major participant in the robbery and acted with a reckless indifference to human life. However, in its ruling, the court did not discuss Tuvalu's youth and its impact, if any, on the analysis of whether Tuvalu was a major participant and acted with reckless indifference.

We invited the parties to submit supplemental briefs addressing whether we should, like the Court of Appeal in *Jones, supra*, 86 Cal.App.5th 1076, reverse the court's order denying Tuvalu's resentencing petition and remand the matter for the trial court to consider Tuvalu's youth as part of the totality of the circumstances. Tuvalu argues his case is analogous to *Jones* and remand is appropriate. The Attorney General, however, asserts a remand is unnecessary because the trial court implicitly considered Tuvalu's youth as a factor in its analysis. We agree with Tuvalu.

The Attorney General contends, as he did in *Jones*, that we must presume the trial court knew and applied the correct case law and therefore considered Tuvalu's youth in its analysis. (See *Jones, supra*, 86 Cal.App.5th at p. 1092.) But similar to the situation in *Jones*, this case presents "unusual circumstances" as Tuvalu's evidentiary hearing occurred before the decision in *Moore*. (*Jones*, at p. 1079.)

Attempting to distinguish *Jones*, the Attorney General points out *Harris* was decided prior to Tuvalu's evidentiary hearing and was cited by Tuvalu's counsel at the hearing. But this distinction is not a persuasive difference. First, *Harris*'s discussion of a defendant's youth as a factor was dictum as the issue in *Harris* was whether a pre-*Banks* and pre-*Clark* special circumstance finding rendered the defendant ineligible for relief as a matter of law. (*Harris, supra*, 60 Cal.App.5th at pp. 944-945.) Second, at the time of Tuvalu's evidentiary hearing, review had been granted in *Harris* (review granted April 28, 2021), and therefore, the opinion had "no binding or precedential effect" but

18

only "potentially persuasive value." (Cal. Rules of Court, rule 8.1115(e)(1).) Thus, the trial court may have given limited or no persuasive weight to *Harris*'s discussion of the relevance of a defendant's youth.

The decision in *Moore* was more direct than *Harris* as to the relevance of a defendant's youth in deciding whether the defendant was a major participant who acted with reckless indifference. (*Moore, supra*, 68 Cal.App.5th at p. 454.) Tuvalu's evidentiary hearing, however, occurred prior to the decision in *Moore*. The trial court issued its written ruling after *Moore* was published, but there is no indication in our record the parties brought *Moore* to the court's attention after the evidentiary hearing. The other cases explaining a defendant's youth at the time of the offense is a factor to consider in the reckless indifference analysis—*Keel*, *Ramirez*, *Harper*, *Jones*, and *Oliver*—were all decided after the trial court issued its written decision in Tuvalu's case. Therefore, it is unlikely the trial court understood and appreciated the relevance of Tuvalu's youth in its analysis.

Discussing Tuvalu's involvement in the robbery, the Attorney General argues a remand is unnecessary here because the youth factor cannot overwhelm all of the other factors.[7] In reaching its conclusion Tuvalu was a major participant in the robbery, the court analyzed each of the factors discussed in *Banks, supra*, 61 Cal.4th at page 803. The court, however, did not discuss its analysis of the reckless indifference factors discussed in *Clark*, stating only its conclusion Tuvalu acted with reckless indifference to life. In the absence of this analysis, we find it difficult to determine how Tuvalu's youth might have impacted the court's evaluation of the reckless indifference factors and cannot conclude the lack of consideration of Tuvalu's youth was harmless.

We conclude the unique circumstances of this case warrant a remand to provide the trial court a meaningful opportunity to consider Tuvalu's youth and maturity

---

[7] The Attorney General does not explicitly argue the error was harmless under *Watson*.

19

in determining whether he was a major participant who acted with reckless indifference to human life.  (See *Jones, supra*, 86 Cal.App.5th at p. 1093.)  This is "a fact-intensive, individualized inquiry" that requires weighing numerous factors (*Scoggins, supra*, 9 Cal.5th at p. 683) and is best left to the trial court in the first instance.

## DISPOSITION

The postjudgment order denying Tuvalu's petition for resentencing under former section 1170.95 is vacated, and the matter is remanded to the trial court for further consideration consistent with this opinion.

MOTOIKE, J.

WE CONCUR:

GOETHALS, ACTING P. J.

SANCHEZ, J.

20